786 A.2d 706

**Rose Mary FISHER and Mary Utley,**

v.

**STATE of Maryland.**

**No. 113, Sept. Term, 1999.**

Court of Appeals of Maryland.

Argued April 6, 2000.

Reargued Jan. 4, 2001.

Decided Dec. 17, 2001.

222

Argued and reargued by Michael R. Braudes, Asst. Public Defender and Thomas J. Saunders, Assigned Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioners.

Argued and reargued by Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, LAWRENCE F. RODOWSKY (Retired, specially assigned), and THEODORE G. BLOOM (retired, specially assigned), JJ.

Reargued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, LAWRENCE F. RODOWSKY (Retired, specially assigned), and THEODORE G. BLOOM (retired, specially assigned), JJ.

RODOWSKY, Judge.

We granted certiorari in this case in order to determine whether Maryland law recognizes the applicability, in any way, of the common law doctrine of felony murder to homicides committed in the perpetration of a felony other than one enumerated in the first degree murder statute, Maryland Code (1957, 1996 Repl.Vol.), Article 27, §§ 408 through 410.[1] As explained below we shall answer that issue in the affirmative and hold that the acts and omissions constituting the statutory felony of child abuse, proscribed by § 35C, but not included in §§ 408 through 410, are the basis, under the circumstances of this case, for applying the felony murder doctrine. Also presented are claims of lack of preservation for

---

1. Unless otherwise indicated, all statutory references in this opinion are to Maryland Code (1957, 1996 Repl.Vol.), Article 27, "Crimes and Punishments."

appeal, of discovery violations, and of error in the exclusion of evidence of psychological profile, all of which we shall reject.

The murder victim in this case was nine year old Rita Fisher who died June 25, 1997.[2] Rita Fisher's fifteen year old sister, Georgia Fisher, was also a victim of child abuse which she survived. The petitioners in this Court, who were two of the three defendants at trial in the Circuit Court for Baltimore County, are forty-nine year old Mary Utley, the mother of the two victims, and twenty year old Rose Mary Fisher, the daughter of Mary Utley and older sister of the two victims. A third defendant, who did not petition this Court, was twenty-one year old Frank E. Scarpola, Jr. (Scarpola), the live-in boyfriend of Rose Mary Fisher. The defendants inflicted the abuse on the victims at 4106 Old Milford Mill Road in the Pikesville area of Baltimore County, where all five persons resided as members of the same household.

The three defendants were convicted of second degree murder. In the cases of Mary Utley and Rose Mary Fisher that verdict was predicated on felony murder. Scarpola's conviction of second degree murder was predicated on both intentional killing and felony murder. All three defendants were also found guilty of child abuse of Rita Fisher from April 15, 1997, through June 23, 1997; child abuse of Rita Fisher on June 24 and 25, 1997; child abuse of Georgia Fisher from April 15, 1997, through June 23, 1997; conspiracy to commit child abuse of Rita Fisher; and conspiracy to commit child abuse of Georgia Fisher. Additionally, Rose Mary Fisher was convicted of child abuse of Georgia Fisher on June 24 and 25, 1997. The circuit court sentenced Scarpola to ninety-five years imprisonment, Mary Utley to seventy-five years imprisonment, and Rose Mary Fisher to thirty years imprisonment. These judgments were affirmed by the Court of Special Appeals, *Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125 (1999). We granted certiorari on the petitions of Rose Mary Fisher and Mary Utley. 356 Md. 634, 741 A.2d 1095 (1999).

---

2. All ages furnished in this opinion are as of June 25, 1997.

The horrid facts of this case are set forth by Judge Charles E. Moylan, Jr., writing for the Court of Special Appeals.

"At 2:41 P.M. on June 25, 1997, nine-year-old Rita Fisher was pronounced dead at the Johns Hopkins Hospital. The subsequent post mortem report of the Office of the Chief Medical Examiner revealed that she had died of dehydration and malnutrition, conditions resulting from inadequate water and food intake. The post mortem report indicated that she had been admitted to the Johns Hopkins Hospital on June 25, the day of her death, and had 'expired as a result of abuse and negligence.'

"Rita Fisher's physical development was described as 'retarded.' Her weight at the time of her death was forty-seven pounds, which was, in the opinion of the assistant medical examiner, considerably less than the average weight of a nine-year-old girl. Other medical records indicated that at an earlier period in her life she had weighed as much as 54–1/4 pounds. The evidence of physical abuse included 'numerous recent and old abscesses and bruises to her head, chest, extremities, and buttocks.' There were 'multiple rib fractures exhibit[ing] a pattern of healing consistent with a severe chest injury several weeks prior to death.' There was evidence of internal bleeding and of subdural bleeding of the brain. In addition, there were 'multiple ligature marks on her wrists and ankles' which 'indicate that she had recently been bound.' There was also evidence that 'a ligature [had been] placed recently around the chest.'

"On the next day, June 26, 1997, Rita Fisher's fifteen-year-old sister, Georgia Fisher, was admitted to the Northwest Hospital Center. Nurse Martha Chinery described Georgia, at the time of her admission, as 'frightened, emaciated, malnourished, bruised, and scarred.'

. . . .

"In the course of a ten-day trial, the State called fourteen witnesses, including one of the victims, Georgia Fisher. The defense called twenty-two witnesses, including the three appellants. The only undisputed facts were that prior to November of 1995, the residents [at 4106 Old Milford Mill

Road] were Mary Utley, Rose Mary Fisher, Georgia Fisher, and Rita Fisher. In November of 1995, Frank Scarpola moved into the residence as well.

"The key witness for the prosecution was Georgia Fisher. Georgia related the abuse that she and her sister Rita had suffered at the hands of her mother, Mary Utley, for years before Scarpola moved in and the abuse that continued once Scarpola became a part of the household. With respect to the time period after Scarpola moved in, Georgia explained how she and Rita had to perform chores such as cleaning the house and looking after the pets and if those chores were not performed, 'we would get a beating.' When asked who, specifically, inflicted those beatings, Georgia answered, 'Frank, Rosie and my mom.' Georgia explained that the beatings would sometimes be with a yardstick and that sometimes the girls would be hit, kicked, or punched by the appellants. Scarpola would sometimes take Georgia and Rita into the basement and would use boxing gloves to hit them. When either of the girls fell down from being hit, Scarpola would order them to get back up so she could be hit again.

"Georgia also described the many hours and days that she and Rita spent in 'the hole.' According to Georgia, 'the hole' was 'a small place [in the basement] that had a toilet and it had a stall and they locked us in there for punishment.' Georgia explained that the 'they' to whom she referred were 'Frank, Rosie and my mom.' The girls would be locked in 'the hole' for 'days at a time' with no light and only an occasional drink brought by the appellant Utley. When asked how often the girls were fed while in 'the hole,' Georgia replied, 'once in a blue moon.' Neither Rita nor Georgia was permitted to go into the refrigerator for food. In fact, at one point a lock was placed on the refrigerator door to prevent just that.

"Georgia testified that, pursuant to Scarpola's orders, she was not permitted to help Rita with her homework. On one occasion when she did so and was caught, Scarpola beat her over the head with a metal flashlight. The beating resulted

in a 'big gash.' Scarpola then proceeded to shave Georgia's head, pour wine over the open wound, and sew the wound with a needle and thread. Georgia did not go to school for several days after the incident. Georgia also described for the jury an occasion, a few months before Rita died, when she had been tied to her bed, gagged, and blindfolded by Scarpola so that he could rape her.

"Georgia stated that she and Rita had been locked in their room for five consecutive days before Rita died. During those five days they were fed 'sometimes' and permitted to use the bathroom once every other hour. At such times, one of the appellants would unlock the girls' bedroom door and accompany the girls into the bathroom. If either of the girls could not 'perform' and use the toilet, she would be hit in the face. While in their bedroom, Rita was forced to sleep on the wooden floor because her mattress had been removed by Scarpola. Rita was required to sleep 'with her arms straight up above her head and [with] her legs straight ... face up.' Georgia was given the responsibility of seeing that Rita did not move from that particular position. If Rita did move, Georgia would be 'held responsible for it' and would be beaten.

"Georgia testified that both she and Rita were kicked in the ribs by Scarpola the week prior to Rita's death. Scarpola then smashed or threw away the girls' toys, including a dollhouse to which Rita was very attached. Scarpola told Rita and Georgia that they would not need the toys any longer because the girls were going 'to go someplace until they were twenty years old,' i.e., an institution.

"The night before Rita died, Scarpola tied Rita up because she had been picking at a wound that Scarpola had earlier inflicted on her chin. Scarpola ordered Georgia to remove the shoestrings from her shoes. He then proceeded to tie Rita's hands to the dresser and her feet to the bed post with those shoestrings. Scarpola ordered Georgia to watch her sister. Georgia testified that during the course of that night and early the next morning, '[Rita] kept yelling [because she had to go to the bathroom] and Frank hit her

and she couldn't be quiet so Frank taped her mouth shut.' Georgia briefly untied her sister in the middle of the night to give Rita some relief, but then, fearing repercussions, she retied Rita after about an hour so that neither of the girls would be caught and punished.

"Georgia then described what transpired on the morning of June 25. Rita 'was blue, I banged on the doors because she kind of mumbled she wanted something to drink.' Scarpola came into the room and struck Georgia. The other appellants then entered. They tried to give Rita a warm bath and they laid her on the floor on a blanket. Georgia then lay down beside her dying sister and 'told her to hang in there,' only to be pushed away by Utley. Georgia was then ordered by the appellants to 'get dressed and to hurry up.' She was ordered by all three appellants 'to lie.'

"Dr. James Locke, the assistant medical examiner who performed the autopsy on Rita on June 26, 1997, catalogued the numerous signs of extensive physical abuse that Rita had suffered. Those injuries included: a bruise on the forehead with bleeding underneath the scalp; abrasions and bruises on the cheek and face; subdural bleeding of the brain; a ligature mark on the chest; abrasions and scratches on the chest; scratches and bruising over the abdomen; a bruise over the left hip; bleeding in the chest cavity; fractures of four separate ribs with two of those ribs containing more than one fracture; bleeding internally within the abdomen; bruises and abrasions on both arms; ligature marks on both wrists; bruises and abrasions on both legs; ligature marks on the left ankle; a group of bruises along the mid-back; numerous abrasions in the back region; and numerous bruises to the buttocks. Dr. Locke also read to the jury the opinion portion of his autopsy report, wherein he wrote:

'This nine-year-old white female, Rita Fisher, died of dehydration and malnutrition, conditions resulting from inadequate food and water intake. She had been admitted to Johns Hopkins Hospital on June 25th, 1997 and expired as a result of abuse and neglect. Her physical

development was retarded, whereas, she weighed 47 pounds, approximately one-half of the average weight of a nine-year-old girl.

'Evidence of physical abuse included numerous recent and old abrasions and bruises to her head, chest, extremities, and buttocks. Multiple rib fractures exhibited a pattern of healing consistent with a severe chest injury several weeks prior to death. Multiple ligature marks on her wrist and ankles indicated that she had recently been bound. There was also a ligature placed recently around the chest. Test for drugs and alcohol were negative. And no evidence of sexual abuse was seen. The manner of death is homicide.'

"Dr. Locke concluded that Rita Fisher was 'deprived of food and water and physically abused.'

"Martha Chinery, a nurse at Northwest Hospital Center, testified that she admitted Georgia Fisher to the hospital on June 26, 1997 at approximately 11:30 p.m. Ms. Chinery described Georgia's physical and emotional condition on being admitted:

'She was just a very scared, withdrawn little girl. Very emaciated. Painfully thin. Malnourished. Her hip bones were sticking out, just a mess. . . . There were bruises all over her body of varying age. . . . [W]e got her off the stretcher into the bed and she just kind of hovered in the fetal position. . . . She wouldn't talk unless spoken to.'

"Ms. Chinery testified about an occurrence on the evening [of] June 27, when Frank Scarpola and Rose Mary Fisher came to visit Georgia at the hospital.

'Well, it was Mr. Scarpola and Rose Fisher. They had come, and I remember him saying, "don't give the nurses a hard time. Don't try and run away." Basically that was what they said. . . . He [Scarpola] also questioned me as [to whether] a pregnancy test been done.'

"Ms. Chinery also testified that Scarpola admitted to having locked Georgia and Rita in their room on prior occasions.

"Numerous social workers, teachers, and administrators in the girls' respective schools testified for the State. Mary Friedman, an instructional assistant in Rita's class the spring before Rita died, testified that on January 7, 1997, Rita came to school with a bruise on her face. When questioned about the cause, Rita ultimately stated that 'My mother hit me.' School personnel notified the Department of Social Services of the abuse.

"All three appellants testified in their own defense. Each, in essence, blamed the others for the crimes committed on the two girls.

"Rose Mary Fisher testified that she had moved out of the residence at 4106 Old Milford Mill Road for a period of several months and that when she returned in November of 1995, she brought her boyfriend of approximately two years, Frank Scarpola, with her. She stated that when she and Scarpola first moved into the home, it was her mother, Mary Utley, who still had the responsibility for disciplining Georgia and Rita. Later, however, Scarpola took over the primary responsibility for disciplining the girls.

"Rose Mary Fisher admitted to having inflicted a very limited amount of physical abuse on the girls, as well as to having locked them in their bedroom and in 'the hole' on at least one occasion when Scarpola was out of town. Rose Mary Fisher admitted that she had hit Georgia on the buttocks with a yardstick once because Georgia had stolen some money. She denied, however, ever having punched or kicked the two girls, ever having withheld food or water from them, ever having had any knowledge that the girls were being deprived of food and water, or ever having had an awareness of the multitude of bruises that were found on Rita's and Georgia's bodies on June 25 and June 26, 1997.

"With respect to the night of June 24, the night before Rita died, Rose Mary Fisher testified that she and Frank went out to dinner to celebrate the third anniversary of their having begun to date and that, upon their return from a restaurant, she went upstairs and went directly to bed. She explained she had no knowledge that Frank had tied

Rita up. The following morning, Rose Mary Fisher went into her sisters' bedroom and noticed that Rita's hands were tied to the dresser. She proceeded to cut the ties loose with a pair of scissors. At the direction of Scarpola, she helped him place Rita in a tub of warm water. Shortly thereafter, either Scarpola or Mary Utley told her to tell the authorities that Rita had fallen down the steps. The three appellants then proceeded to the hospital where Rita had been taken. Rose Mary Fisher denied [ever] having had any intention to harm either Georgia or Rita.

"With respect to her relationship with Scarpola, she testified that Scarpola made all of the decisions. She also stated that Scarpola had struck her on more than one occasion and that he had locked her in unspecified rooms in the house on more than one occasion.

"Mary Utley, the mother, next testified. She laid much of the blame for the abuse committed on the girls on Scarpola. Utley testified that in early 1996 Scarpola 'took control' over Rita's and Georgia's schedules, including the chores they were to do, their homework, and their discipline. According to Utley, Scarpola's punishments increased in harshness and, when Utley expressed her disagreement with such punishing, he responded by calling her an 'unfit mother,' 'dumb,' or 'stupid.' Scarpola would sometimes strike Utley. Utley also detailed that as part of Scarpola's exercise of control over the entire household, he took the phone cord off the downstairs phone so that Utley could not use it, he locked Utley in her room, and he imposed a curfew on her. Utley denied ever having locked Rita or Georgia in 'the hole,' although she did acknowledge an awareness that the girls were being put down there. Utley testified that she did not intervene because she was 'afraid of making things worse for them.' Utley did contend that she took the girls food and water while they were in 'the hole.'

"Mary Utley admitted that she realized that there were 'problems in the home.' She ultimately called the Department of Social Services. When asked why she had resorted to doing so, she explained:

'For the main fact that things were really out of control, it—Frank was totally in control. And there was no reasoning with him and [no] talking to him about anything. And the fact that he wanted to put the girls in an institution.'

"Utley met with a social worker, Tear Plater, at Utley's place of employment on June 24, 1997. She explained that, prior to the June 24 meeting with Tear Plater, 'I couldn't do it at home because Frank made clear that if I went over his head that he would see to it that I was put into an institution and my house would be taken away.' At that meeting between Utley and Ms. Plater, a home visit was scheduled for June 26. It never took place because Rita died the day before.

"On the evening of June 24, Utley returned from work to find Rita and Georgia in their room, with Rita 'sitting Indian style up against the bureau.' Utley denied having any knowledge that Rita was tied up. Scarpola informed Utley that the girls 'had just been repunished' for lying to him. After questioning the girls about why they had lied, Utley went downstairs to fix dinner for herself, Rita, and Georgia. She gave the food for the girls to Scarpola and she later received back two empty plates. She concluded that Rita and Georgia had eaten. Thereafter, she went to bed. The following morning when she awoke:

'Frank unlocked my door and told me to go downstairs and call [Kennedy Krieger Institute] to say that Rita would not be in [presumably for an appointment], that she was still sick with the flu.'

"Utley complied. When she later went to the girls' bedroom, she noticed that Rita was 'looking very bad.' Utley testified that she intended to call the pediatrician to obtain help for Rita but 'she died before I had a chance to.' She then called 911. When questioned about that 911 call, she replied that she 'told them that I found her at the bottom of the steps' because she had been 'told to say that.' She elaborated:

'I told doctors and police [that Rita had fallen down the stairs], yes.... I was scared ... Frank had said that if we didn't tell the same story that we would all answer to him.'

"Utley then went to the Johns Hopkins Hospital where she was informed that Rita had died.

"Utley also testified in some detail about Scarpola's exercise of control over the household. She explained that she never called the Department of Social Services or anyone for help because Scarpola had 'made it very clear that if I would call or contact anyone that I would be put in a mental institution and my children would live with him and Rose.' Scarpola would occasionally make the girls stand in a corner with their hands straight up in the air. When Utley objected, Scarpola would either hit her or call her an 'unfit mother.' During the days leading up to Rita's death, Utley admitted that she never checked on the girls to ensure their well-being. She explained that she failed to do so because 'Frank would not allow anybody in the room but himself.' Utley exonerated her daughter Rose Mary Fisher to a large extent. She testified that Scarpola did all of the punishing of Rita and Georgia and that Rose Mary only did so 'when he demanded Rosie to do it.'

"Frank Scarpola was the last of the three appellants to testify. He stated that he moved into the Old Milford Mill Road home in November of 1995 and that at that time, the house 'looked like a junkyard' and was a 'complete wreck' with 'mice and roaches' throughout the house. He acknowledged having become involved in disciplining Rita and Georgia Fisher in the spring of 1996, approximately three months after he had moved in, largely because Mary Utley could not handle the two children on her own. Scarpola painted a picture of himself as the Good Samaritan, entering an already unstable and chaotic household for the purpose of trying to restore some kind of order. According to Scarpola, in early 1997 he contacted the Department of Social Services in an effort to get help for the family, and he further arranged for Rita to be seen at the Kennedy Krieg-

er institute. Scarpola denied ever having hit the girls with boxing gloves or having punched them. He denied ever having hit Georgia over the head with a metal flashlight. According to Scarpola, Georgia made up the story as to how she received the injury. He did, however, admit to shaving her head, pouring alcohol over the wound and sewing it, because he thought he could take care of it himself without seeking medical attention. He insisted that he 'loved [Rita] like she was my daughter' and that he would never do anything intentionally to harm either Rita or Georgia because he 'cared about both of them too much.'

"Scarpola did, however, admit to having inflicted numerous punishments on both girls. He explained that when efforts at 'normal punishments' failed, he would then resort to measures such as spanking with a belt or a paddle and 'occasionally' smacking the girls. He admitted to placing a lock outside of the girls' bedroom to lock them in because he could not trust them any longer.

"On the night before Rita's death, Scarpola admitted to having tied her to a dresser with shoestrings. According to Scarpola, Rita had fallen and hit her chin on the floor, causing her chin to bleed. Rita would not stop 'picking at' the wound on her chin, so Scarpola tied her up to 'stop her from hurting herself.' Scarpola explained that he tied the strings very loosely. He insisted that it was Georgia who, after briefly untying her sister in the middle of the night to play with her for about an hour, had retied the strings too tightly. Scarpola denied having any knowledge that Rita was dehydrated or malnourished. He further claimed that he only knew of a few bruises on Rita's buttocks and back. Scarpola added that it was Mary Utley's idea to lie to the authorities and tell them that Rita had fallen down the stairs."

*Fisher,* 128 Md.App. at 87, 90–99, 736 A.2d at 1129, 1130–35 (footnotes omitted).

Additional facts will be presented as particular issues are discussed.

I

██ By conditional cross-petition and by its brief in this Court, the State contends that the petitioners have failed to preserve the issue of whether second degree felony murder is a cognizable offense under Maryland law. The Court of Special Appeals held that there was a failure to preserve. *Id.* at 99–108, 736 A.2d at 1135–40. Responding to Mary Utley's argument there that she had been convicted of a crime that did not exist, the Court of Special Appeals pointed out that Mary Utley had been convicted of murder "and murder is not a non-existent crime." *Id.* at 105, 736 A.2d at 1139. In this Court Mary Utley acknowledges that she did not raise cognizability in any way at trial. Rose Mary Fisher acknowledges that she did not raise the legal issue at trial, but she did except to the trial court's submitting second degree felony murder to the jury on the ground that it did not fit the facts of the case.

In the circuit court, the trial judge seems to have been the architect of submitting second degree felony murder to the jury. On the Friday preceding the Monday on which the court instructed the jury, court and counsel discussed the verdict sheet. The court proposed that the homicide issues were premeditated first degree murder, three types of second degree murder (intentional, depraved heart, and felony), and manslaughter.[3] Counsel for Mary Utley expressed surprise that felony murder would be submitted. The trial judge then delivered a short lecture on felony murder to counsel. He took the position that the doctrine could apply to murders in the perpetration of felonies other than those specified in §§ 408 through 410. He recognized that there was a question whether residual felonies that could underlie the doctrine must be inherently dangerous, but he stated that it was unnecessary "to get into all felonies [that] make up second degree felony murder" because "[i]n my view child abuse-I have no question that child abuse would be an inherently dangerous felony

---

**3.** The indictment simply charged murder in the statutory form. *See* § 616.

which would serve as the basis for second degree felony murder." Concluding his lecture, the judge referred counsel to Maryland Criminal Pattern Jury Instructions at 255 and suggested that counsel start their research there.[4]

Whether second degree felony murder is a cognizable crime was highlighted when the jury returned its verdicts, finding that the petitioners were not guilty of first degree, premeditated murder and not guilty of second degree murder of the intentional or depraved heart varieties.

 Under Maryland Rule 8–131(a) a Maryland appellate court "[o]rdinarily ... will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court...." Use of the word "ordinarily" connotes that the appellate court has discretion to consider issues that were not preserved. This discretion is exercisable by each appellate court, independently. *Squire v. State,* 280 Md. 132, 134–35, 368 A.2d 1019, 1020 (1977). Consequently, even though the Court of Special Appeals declined to consider the cognizability of second degree felony murder, this Court is not precluded thereby, in its discretion, from doing so. *Id.*

---

4. The reference by the circuit court was to the comment following the pattern instruction on **"HOMICIDE—FIRST DEGREE FELONY MURDER."** The comment in relevant part reads:

"The question remains whether nonstatutorily enumerated felonies can serve as an underlying felony to support felony murder, and, if so, whether they must be inherently dangerous felonies. If other felonies can suffice for felony murder, the result is murder in the second degree. Md. Ann.Code art. 27, § 411; *see* R. Perkins & R. Boyce, *Criminal Law* 65 n. 45 (3d ed.1982). It appears that, with the exception of manslaughter, other inherently dangerous felonies can suffice, e.g., sabotage, injecting an addict with heroin. *See* W. La-Fave & A. Scott, Jr., *Criminal Law* § 7.5, at 623–25 (2d ed.1986); Perkins, *supra* at 62–70. The Court of Appeals implicitly recognized nonstatutorily enumerated felonies as supporting felony murder when it recognized, but left unresolved, the issue of whether felony murder could be supported by a noninherently dangerous felony. *Jackson v. State,* 286 Md. 430, 435 n. 3, 408 A.2d 711, 714–15 n. 3 (1979). At common law, any felony could support felony murder but the clear trend is to require an inherently dangerous felony. *See Lindsay v. State,* 8 Md.App. 100, 104–05 nn. 6 & 7, 258 A.2d 760, 763–64 nn. 6 & 7 (1969), *cert. denied,* 257 Md. 734 (1970)."
MPJI–Cr § 4:17.7, at 255–56 (MICPEL Supp.1997).

For the following reasons we shall exercise our discretion to do so in the instant matter.

There are strong similarities between the case before us and *Moosavi v. State*, 355 Md. 651, 736 A.2d 285 (1999). There we considered an issue which the Court of Special Appeals considered not to have been preserved, namely, whether the accused had been charged and convicted under a statute that did not apply to his conduct. Two factors persuaded us to consider the unpreserved issue. First, if the statute under which the accused was convicted "is clearly inapplicable to Moosavi's conduct, and if the only reason for not reversing his conviction is the failure of appellate counsel to raise the issue in the Court of Special Appeals, under the circumstances of this case Moosavi would be entitled to relief in an appropriate post conviction proceeding collaterally attacking his conviction." *Id.* at 661–62, 736 A.2d at 290. Here, the petitioners' assumed post-conviction claim would have merit under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Manifestly the result would be altered if the guilty verdicts were predicated on a method of proof of malice in the homicide that, as a matter of law, should never have been submitted to the jury.[5] Further, and again assuming non-cognizability, it would be most difficult for the State to demonstrate that defense counsel had nevertheless been effective, under an objective standard of reasonableness, when they failed to preserve the cognizability and/or the applicability of child abuse to felony murder after the trial judge had told them that the applicability issue was an unsettled question in Maryland and after he had directed them to authority evidencing that the law of Maryland was unsettled on both points.

■ A second reason which we gave in *Moosavi* for exercising our discretion was that a sentence imposed under an entirely inapplicable statute "is an illegal sentence which may

---

**5.** The relationship between malice and the perpetration of the underlying felony is discussed in Part III.C.

be challenged at any time." *Moosavi,* 355 Md. at 662, 736 A.2d at 291 (citing *Campbell v. State,* 325 Md. 488, 508–09, 601 A.2d 667, 677 (1992); *Matthews v. State,* 304 Md. 281, 288, 498 A.2d 655, 658 (1985); *Walczak v. State,* 302 Md. 422, 427, 488 A.2d 949, 951 (1985)). Here, if the felony murder doctrine has no application to a homicide resulting from child abuse, then the thirty year sentences for murder in the second degree imposed on the petitioners would be similarly illegal, because, by the special jury verdict, the findings of guilty of murder were based solely on felony murder.

Another reason for exercising our discretion is the desirability of having the issue resolved. This Court's opinion in *Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1979), discussed in Part III.A, *infra,* recognizes second degree felony murder only implicitly. The Court of Special Appeals has recognized that §§ 408 through 410 do not abrogate the common law offense of felony murder, *Warren v. State,* 29 Md.App. 560, 565, 350 A.2d 173, 177–78 (1976). That court also has noted in dicta on several occasions the existence of the common law offense of felony murder in the second degree. *See, e.g., Harvey v. State,* 111 Md.App. 401, 408, 428, 681 A.2d 628, 631, 642 (1996); *Oates v. State,* 97 Md.App. 180, 186, 627 A.2d 555, 559 (1993); *Lamb v. State,* 93 Md.App. 422, 454, 613 A.2d 402, 418 (1992); *Evans v. State,* 28 Md.App. 640, 697, 349 A.2d 300, 335–36 (1975), *aff'd,* 278 Md. 197, 362 A.2d 629 (1976).

Further, a principal purpose of the preservation requirement is to prevent "sandbagging" and to give the trial court the opportunity to correct possible mistakes in its rulings. That purpose is not served here. Clearly, the trial court fully understood the ramifications of its decision to submit second degree felony murder, and it is a practical certainty that any objection on non-cognizability grounds that counsel might have made for the record would not have resulted in withdrawing felony murder from the jury.

## II

■ Before addressing the merits of the cognizability issue there is another threshold question that must be resolved. It

involves the construction of § 35C(b)(2) which, at the time of the death of Rita Fisher, provided for a maximum sentence of twenty years if the child abuse violation "results in the death of the victim." If we were merely to assume that second degree felony murder is generally cognizable, but hold that, in any event, § 35C(b)(2) preempts second degree felony murder based on child abuse, then the issue of the general cognizability of second degree felony murder need not be reached in this case. We directed the parties supplementally to brief the effect of § 35C(b)(2), and we held reargument thereon.

Section 35C, as of June 25, 1997, read in relevant part as follows:

"(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

"(2) 'Abuse' means:

"(i) The sustaining of physical injury by a child as a result of cruel or inhumane treatment or as a result of a malicious act by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or threatened thereby;

. . . .

"(3) 'Child' means any individual under the age of 18 years.

"(4) 'Family member' means a relative of a child by blood, adoption, or marriage.

"(5) 'Household member' means a person who lives with or is a regular presence in a home of a child at the time of the alleged abuse.

. . . .

"(b) *Violation constitutes felony; penalty; sentencing.*— (1) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child or a household or family member who causes abuse to the child is guilty of a felony and on conviction is

subject to imprisonment in the penitentiary for not more than 15 years.

"(2) If the violation results in the death of the victim, the person is guilty of a felony and upon conviction is subject to imprisonment for not more than 20 years.

"(3) The sentence imposed under this section may be imposed separate from and consecutive to or concurrent with a sentence for any offense based upon the act or acts establishing the abuse."

What is now § 35C(b)(3) was enacted by Chapter 604 of the Acts of 1990 for the express purpose of overruling the holdings in *Nightingale v. State,* 312 Md. 699, 542 A.2d 373 (1988), and in *White v. State,* 318 Md. 740, 569 A.2d 1271 (1990), which had applied the rule of lenity to multiple sentences in child abuse cases. In *Nightingale,* this Court treated a conviction of second degree sexual offense under § 464A(a)(3) as a lesser included offense of sexual child abuse, and we struck the additional sentence that had been imposed by the trial court for the sexual offense violation. In *White,* consecutive sentences had been imposed for murder in the first degree and for child abuse. Applying the rule of lenity we merged the child abuse conviction into the murder conviction.

The purpose clause of Chapter 604 of the Acts of 1990 declares that the Legislature intended to allow the imposition of multiple sentences "if a conviction is entered against an individual for murder, rape, sexual offense, any sex crime, or any crime of physical violence, and a conviction is also entered for child abuse." The philosophy underlying present § 35C(b)(3) is articulated in a letter from an Assistant Attorney General to the Chairman of the House Judiciary Committee urging adoption of the bill that enacted § 35C(b)(3). In part the letter reads:

"**Child abuse and the underlying crimes involve separate societal evils.** The underlying crime is one of violence against a member of society. Child abuse is a breach of custodial or familial trust. The two crimes should be pun-

ished separately and the person who violates both laws should be exposed to a greater possible penalty."

In the instant matter the trial court imposed separate sentences on the child abuse, conspiracy, and murder counts. Violation of § 35C(b)(2) was not charged against either petitioner.[6]

■ Present § 35C(b)(2) was enacted by Chapter 372 of the Acts of 1991. The parties agree that § 35C(b)(2) is a penalty enhancing statute and that it does not create a separate crime. We so hold. The statute treats resulting death as an aggravated form of child abuse for which the maximum penalty was increased in 1991 from fifteen years to twenty years.[7] It would seem that the elements of this aggravated form of child abuse are identical to those facts that necessarily must be present if second degree felony murder may be predicated on child abuse. Thus, the question arises whether § 35C(b)(2) in any event would preempt or supersede second degree felony murder resulting from child abuse. The answer lies in legislative intent, ordinarily by determining whether the purpose of the new statutory provision is to deal with the entire subject matter.

Recently, in *Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999), the question was whether Chapter 632 of the Acts of 1996, enacting §§ 12 through 12A–1, abolished the common law crimes of assault and battery or whether that enactment simply divided the common law crime into degrees for the purpose of punishment. We held that the 1996 enactment abrogated the common law offenses primarily because "the[se] statutes explicitly repealed and replaced the entire *statutory* scheme for aggravated assaults then existent." *Id.* at 694, 728 A.2d at 703. We said that "[t]he new statutes thus subsumed all previous statutory assault provisions as well as the common

---

6. As to the effect of the absence of such a charge on the sentence imposed on Utley, see Part VI, *infra.*

7. As discussed below the Legislature subsequently increased the penalty in § 35C(b)(2) for fatal child abuse from twenty to thirty years by Chapters 372 and 373 of the Acts of 1998.

law into a single scheme and established a two-tiered regimen." *Id.*

In the consolidated theft statute the General Assembly expressly stated its intent to abrogate the common law when it said that the "[c]onduct designated as theft in this subheading constitutes a single crime embracing, among others, the separate crimes heretofore known as larceny, larceny by trick, larceny after trust, embezzlement, false pretenses, shoplifting, and receiving stolen property." § 341. *See also West v. State,* 312 Md. 197, 202–03 n. 1, 539 A.2d 231, 233 n. 1 (1988). On the other hand, as we demonstrate in Part III.A, *infra,* the enactment of the statutes dividing murder into degrees does not abrogate that common law offense. In the case before us neither the text of the child abuse statute nor the legislative history of § 35C(b)(2) evidence an intent to abolish common law murder based on conduct to which the new statute might also be applicable.

We look first at the words of the statute. If second degree felony murder is a cognizable offense, then giving preemptive effect to subsection (b)(2) would conflict directly with subsection (b)(3). The latter was expressly enacted to permit multiple punishments when the same conduct constituted multiple crimes.

Further, the legislative history of the 1991 amendment adding (b)(2) reflects that its purpose was to enhance punishment for fatal child abuse based on a state of facts that would be easier to prove than murder—not to abrogate the crime of murder when it resulted from child abuse. The bill that became subsection (b)(2) was introduced at the request of the State's Attorneys' Association. The bill's object is set forth in a letter from Alexander J. Palenscar, then Deputy State's Attorney for Baltimore City, to the Chairman of the Senate Judicial Proceedings Committee, dated March 26, 1991, after the bill had been passed by the House of Delegates. Mr. Palenscar in part said:

"We have had several heinous cases of child abuse, where death results but where the evidence falls short of murder.

Some of these incidents are: dipping an infant in scalding water because the baby wet its bed; a child that was knocked down a flight of steps rendered unconscious and no medical attention requested for 24 hours; and others.

"If child abuse is worthy of 15 years imprisonment, an added tragedy of the death of the abused child is worthy of twenty years[.] If I could have proven murder, I would have so charged and the penalty would have been 30 years." [8]

The floor report from the Senate Judicial Proceedings Committee reinforces the intent to permit multiple punishment by stating in part:

"This penalty [twenty years] would be in addition to any other offense. In other words, under the provisions of Article 27, Section 35[C(b)(3) ], the defendant could be convicted of manslaughter (10 years) or murder (30 years/ 2nd degree, life/1st degree), depending upon the facts of the case, in addition to a conviction for child abuse."

In 1998, by identical enactments, Chapters 372 and 373 of the Acts of that year, subsection (b)(2) was amended to increase the maximum penalty for fatal child abuse from twenty years to thirty years. As introduced, these bills would have added child abuse to the list of crimes in § 410 that are predicates for first degree murder. The bill analysis by the House Judiciary Committee of one of those bills (House Bill 1080), while it was in the form as introduced, described the effect as follows:

"Under current law in Article 27, § 35C, a person convicted of child abuse that results in the death of a child could receive not more than 20 years under that statute. In addition, the person could receive an additional 30 years for second degree murder, making the person eligible for a

---

**8.** It may be an unarticulated premise of Mr. Palenscar's letter that second degree felony murder was not cognizable. Any such belief, however, would not mean that the General Assembly intended, by enacting subsection (b)(2), to abrogate any common law crime that arose out of the same conduct as that described in subsection (b)(2).

total of 50 years' imprisonment. This bill would change what is now a second degree murder to first degree murder. In addition to the 20 year imprisonment term available under Article 27, § 35C for child abuse, the person would receive either life imprisonment, life without parole, or the death penalty."

House Bill 1080 and its companion bill, Senate Bill 329, were amended in the course of passage to the form in which § 35C(b)(2) reads today. The floor report of the Senate Judicial Proceedings Committee on amended Senate Bill 329 in part states:

"Under the bill, a person convicted of child abuse that results in the death of a child could receive not more than 30 years. Current law in Article 27, § 35C(b)(3) also provides that a person can be sentenced for the underlying offense as well. Therefore, in addition, the person could receive an additional 30 years for second degree murder, making the person eligible for a total of 60 years' imprisonment."

These reports make clear that § 35C(b)(2) was not intended to supersede any other offense arising out of conduct also constituting the child abuse that resulted in the death of a child. Consequently, petitioners' convictions and sentences for second degree felony murder were not illegal based on the fact that, at the time of the death of Rita Fisher, subsection (b)(2) was available to punish the same conduct that underlay the convictions and sentences for second degree felony murder based on child abuse.

We turn then to whether, in Maryland, the crime of murder may be established under the felony murder doctrine utilizing child abuse as the felony. If so, the murder would necessarily be in the second degree under § 411.

### III

The petitioners advance three arguments in support of their contention that second degree felony murder is not part of Maryland law. These are: (A) the felonies that may underlie

felony murder are limited to those expressly incorporated in §§ 408 through 410; [9] (B) if any additional felonies are to be recognized as a basis for the felony murder doctrine, they are limited to crimes constituting felonies at common law; and (C) if statutory felonies creating offenses unknown at common law may be a basis for the doctrine, the only qualifying crimes are those which are inherently dangerous to life as determined by considering the elements of the crime in the abstract. In this Part III we consider and reject each of these contentions.

## A

Sections 408 through 410 were originally enacted by Chapter 138, § 3 of the Acts of 1809 (the 1809 Act). That statute in turn was patterned on a Pennsylvania statute enacted in 1794. *See* 1794 Pa. Laws, ch. 1766, § 2, *in* 3 *Smith and Reed's Pennsylvania Laws* 187 (1810). The status of the felony murder doctrine at that time is described in R. Moreland, *The Law of Homicide* (1952), where the author states:

---

9. As of June 25, 1997, these statutes read as follows:

" § 408. Same—Murder committed in perpetration of arson.

"All murder which shall be committed in the perpetration of, or attempt to perpetrate, arson in the first degree shall be murder in the first degree.

" § 409. Same—Murder committed in burning barn, tobacco house, etc.

"All murder which shall be committed in the burning or attempting to burn any barn, tobacco house, stable, warehouse or other outhouse, not parcel of any dwelling house, having therein any tobacco, hay, grain, horses, cattle, goods, wares or merchandise, shall be murder in the first degree.

" § 410. Same—Murder committed in perpetration of rape, sodomy, mayhem, robbery, burglary, kidnapping, storehouse breaking, daytime housebreaking or escape.

"All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, kidnapping as defined in §§ 337 and 338 of this article, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City Detention Center, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree."

"The early law placed a great deal of stress upon whether the act which occasioned a particular injury was a lawful or an unlawful one. . . .

"One of the most notable applications of the classification occurs in the law of crimes in the felony murder doctrine. Coke [1680] states that all killing resulting from the commission of an unlawful act is murder. Hale's discussion [1778] is not clear, but he seems to consider that it would be murder only if the unlawful act is a felony. At any rate it was clearly established by the time of Foster [1791] that the unlawful act underlying the homicide must be a felony in order to render it murder. Other commentators reiterate the same rule."

*Id.* at 42, 539 A.2d 231 (footnotes omitted). The other commentators referred to by Moreland include East (1806) and Hawkins (1824).

Blackstone wrote that "if one intends to do another felony, and undesignedly kills a man, this is also murder." 4 W. Blackstone, *Commentaries on the Laws of England* 201 (Dawson of Pall Mell Reprint 1966) (1756). In R.M. Perkins & R.N. Boyce, *Criminal Law* 62 (3d ed.1982), the authors conclude that the "accepted view when Blackstone's Commentaries were published shortly before the Revolution" was that a homicide resulting from any *malum in se* felony was murder.

The penalty for murder at common law was death. *Hardy v. State,* 301 Md. 124, 137, 482 A.2d 474, 481 (1984); *State v. Wooten,* 27 Md.App. 434, 437 & n. 4, 340 A.2d 308, 310 & n. 4 (1975). Under the 1809 Act murder in the first degree was punished by "death, by hanging by the neck" and murder in the second degree by "confinement in the penitentiary-house . . . for a period of not less than five nor more than eighteen years." Thus, the 1809 Act, by dividing murder into degrees, continued the death penalty for those murders statutorily classified as first degree and diminished the penalty for "all other kinds of murder [which was] deemed murder of the second degree." Acts of 1809, ch. 138, § 3.

■ As we shall see in Part III.C, *infra*, the common law of felony murder has changed since colonial times, but, in Maryland, it has done so as a matter of common law evolution and not as a result of the 1809 Act. With respect to that act, this Court has said:

" 'Murder' is here recognized as a general denomination, including offenses differing from each other in their degrees of atrocity, but not in their nature or kind; *no attempt is made to* explain or modify its meaning or *abridge its range.* Its common law sense is left unimpaired; the measure of punishment *only* is sought to be graduated according to the circumstances under which it was committed.

" . . . This Act of Assembly, now codified, does not create a new crime; it neither adds to *nor diminishes* the class of cases which constituted murder at common law; nor does it increase the punishment."

*Davis v. State,* 39 Md. 355, 374 (1874) (emphasis added).

When discussing the intent of the 1809 Act, as amended from time to time, this Court has never attributed to the statute a purpose beyond that set forth in *Davis. See Hardy,* 301 Md. at 137, 482 A.2d at 481 ("[F]rom *Weighorst* [*v. State,* 7 Md. 442 (1855) ] to the present, we have consistently maintained that the 1809 Act did not abolish the common-law concept of murder, but merely divided it into degrees for punishment purposes."); *Campbell v. State,* 293 Md. 438, 441, 444 A.2d 1034, 1036 (1982) ("[S]ections [407 through 410] do not create any new statutory crimes, but rather divide the crime of murder, as known at common law, into degrees."); *Gladden v. State,* 273 Md. 383, 390, 330 A.2d 176, 180 (1974) (same); *Chisley v. State,* 202 Md. 87, 96, 95 A.2d 577, 581 (1953) ("Pennsylvania holds, as does Maryland . . . that a division of murder into first and second degree does not change its common law status as one crime."); *Wood v. State,* 191 Md. 658, 666–67, 62 A.2d 576, 580 (1948) (citing *Davis* for the proposition that the "common law sense" of murder is "left unimpaired" by the subject statutes); *Weighorst,* 7 Md. at 451 ("The design [of the 1809 Act] was to discriminate in awarding the punishment.").

*Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1979), involved "the accidental killing of a hostage by a law enforcement officer attempting to apprehend robbers fleeing from an armed robbery while holding the hostage at gunpoint." *Id.* at 431, 408 A.2d at 712. The issue was whether the felony murder doctrine applied under those circumstances. Judge Orth, writing for the Court, said:

"[M]alice aforethought is established, *inter alia,* upon commission of criminal homicide in the perpetration of, or in the attempt to perpetrate, a felony." [3]

---

" 3 There is suggestion that the common law rule ultimately required that the underlying felony be one 'dangerous to human life.' Lindsay v. State, 8 Md.App. 100, 105, n. 6, 258 A.2d 760 (1969), 8 Md.App. 100, 258 A.2d 760, *cert. denied,* 257 Md. 734 (1970). But Blackstone did not qualify the underlying felony. 4 W. Blackstone, Commentaries *200. And Clark and Marshall, A Treatise on the Law of Crimes § 10.07 (7th ed.1967) includes burglary and larceny among the felonies within the common law rule. In any event, the underlying felony here, which we ascertain *infra* to be kidnapping, fits the category of one dangerous to human life, and we need not now be concerned with whether the qualification was recognized when the common law of England was constitutionally incorporated into our law ."

*Id.* at 435, 408 A.2d at 714–15. Thus, even though at the time *Jackson* was decided kidnapping was one of the crimes enumerated in § 410, *i.e.,* in that section which determines whether the murder is in the first degree, the analysis in *Jackson* did not treat the § 410 enumeration as determinative of whether a felony may be the predicate for felony murder. The above-quoted statement—that one looks to the dangerousness of the felony—is part of the rationale articulated to support the holding and so should be considered to be part of the holding itself.

We agree with the *dicta* statement by Judge Moylan, writing for the court, in *Evans, supra,* where he said:

"It is sometimes falsely asserted that §§ 408–410 constitute [the] felony-murder doctrine in Maryland. That is not true. The felony-murder doctrine is the common law rule—defining one of the at-least three varieties of implied malice—which raises a homicide resulting from the perpetration

or attempted perpetration of a felony to the murder level generally. It is only at that point, after the felony-murder rule has already operated, that §§ 408–410 come into play to provide further that in the case of certain designated felonies, the *already established murder* shall be punished as murder in the first degree."

28 Md.App. at 686 n. 23, 349 A.2d at 329–30 n. 23 (internal cross-reference omitted).[10]

■ Consequently, we hold that §§ 408 through 410 do not exclusively identify those felonies that may be the predicate for felony murder.

## B

■ In support of their contention that second degree felony murder should be limited to felonies as they were at common law, the petitioners cite only the following passage from W.R. LaFave and A.W. Scott, Jr., *Criminal Law* § 7.5(b), at 623–24 (Student 2d ed.1986):

"In many states, the felony-murder rule has been limited in scope by a requirement that the felony attempted or committed by the defendant must be dangerous to life. Similarly, other courts have required that the felony be one of the few which were felonies at common law (i.e., rape, sodomy, robbery, burglary, arson, mayhem, larceny), or that the felony in question be *malum in se* rather than *malum prohibitum*. The latter two limitations are quite similar to

---

**10.** This common law basis for felony murder in Maryland distinguishes our jurisprudence from that of states that have adopted a criminal code in lieu of the common law of crimes. For example, in Arizona "[c]ommon law crimes have not survived ... and there must be a statute specifically prohibiting the questioned act." *State v. Dixon,* 109 Ariz. 441, 511 P.2d 623, 624 (1973) (en banc) (internal quotation marks omitted). In that case the accused had sold heroin to a user who, without the dealer's assistance and outside of his presence, injected himself with the drug and then died. The court held that there was no second degree felony murder in Arizona, reasoning that "[t]he legislature, after considering whether to enact the common law felony murder rule, limited it to homicides occurring during the commission of arson, rape, robbery, burglary, or mayhem." *Id.* at 625.

the first: with the exceptions of larceny and consensual sodomy, all the common-law felonies (and especially robbery, arson and rape) involve a danger to life; and generally the felonies which are designated *malum in se* as distinguished from those *malum prohibitum* likewise involve this danger to life. The limitation is best worded, however, in language of dangerousness rather than in terms of common-law felonies or of felonies which are *mala in se.*"

(Footnotes omitted).

LaFave and Scott cite two cases as illustrating limitation of the felony murder doctrine to common law felonies. These are *Commonwealth v. Exler,* 243 Pa. 155, 89 A. 968 (1914), and *People v. Pavlic,* 227 Mich. 562, 199 N.W. 373 (1924). Neither opinion persuades us that the proposition for which they are cited is the law.

In *Pavlic,* the defendant had been convicted of involuntary manslaughter based on selling the victim "moonshine whisky, the drinking of which, followed by exposure, caused his death." *Id.* at 373. The defendant contended that he was not guilty of manslaughter because selling non-tax paid whiskey was a felony and the homicide would be murder. For three reasons the court rejected this contention. The violation of the liquor law was only *malum prohibitum* and not *malum in se;* it was not a common law felony; and, "[n]otwithstanding the fact that the statute has declared [the offense] to be a felony, it is an act not in itself directly and naturally dangerous to life." *Id.* at 374. After having touched all the bases, the court reversed the manslaughter conviction for insufficient evidence.

*Exler* did not involve second degree felony murder. The issue was whether the defendant could be convicted of first degree felony murder based on a death resulting from carnal knowledge. Carnal knowledge had been criminalized in Pennsylvania by an 1887 statute that described the offense as felonious rape. The court held that the statute did not create a crime within the meaning of "rape" as used in the first degree murder statute because that term was limited to

common law rape requiring a lack of consent. *Exler,* 89 A. at 971.

An indication that the Pennsylvania law recognized [11] second degree felony murder is found in *Commonwealth v. Bowden,* 456 Pa. 278, 309 A.2d 714 (1973). There, the defendant had invited the victim to share a bag of heroin. At the victim's request the defendant injected the victim with the latter's share of the drugs. The defendant was convicted by a jury of second degree murder, but the trial court set that conviction aside. On the Commonwealth's appeal that judgment was affirmed. Three justices, in the opinion announcing judgment, analyzed the matter under second degree, intentional murder law. Three other justices found that analysis incomplete. In a concurring opinion they considered whether the conviction could have been sustained on a second degree felony murder theory. The test which those justices applied was that the prosecution must, in addition to showing that death resulted during the commission of a felony, "demonstrate that the felonious *conduct* posed an unreasonable threat to life or serious bodily harm." *Id.* at 719 (Nix, J., concurring) (emphasis added). When applying that standard to the case before them, the concurring justices looked at the actual facts of the crime, saying:

> "An injection of heroin into the body of a user of narcotics in a dosage consistent with his prior habit does not represent the serious threat of death or grave bodily harm that would allow a court to conclude that the framing of an intention to perform these acts exhibited the characteristics which would be comparable to the legal malice required for murder."

*Id.*

A second degree felony murder rule that limits application of the doctrine to common law felonies, if embraced by any

---

11. In 1974 Pennsylvania amended its murder statute and defined all criminal homicides committed in the perpetration of "a felony" as murder of the second degree. *See* Pa. Consol. Stat. § 2502(b) (West 1998).

courts at all, is a distinct minority position that we are not persuaded to adopt.

## C

Petitioners' third argument attacking their felony murder convictions is made against the background of modern felony-murder law. The commentators agree that, in order to ameliorate the harshness of the strict common law felony murder doctrine, many jurisdictions limit the predicate felonies to those that are dangerous to life. *See* LaFave & Scott § 7.5(b), at 623; Perkins at 65; Clark & Marshall, *A Treatise on the Law of Crimes* § 10.07, at 658 (7th ed.1967). Relying principally on authority from California, discussed *infra,* petitioners submit that the dangerous to life limitation is satisfied only when the elements of the crime, considered in the abstract, do not admit of any state of facts under which the crime could be committed without danger to life. The State contends that, in determining dangerousness to life, one looks not only at the elements of the crime, but also at the circumstances under which it was committed in the particular case.

A leading opponent of unlimited application of the felony murder doctrine was the English jurist, James Fitzjames Stephen. His charge to a jury in a felony murder prosecution based on arson, *Reg. v. Serné,* 16 Cox Crim. Cas. 311 (1887), has been frequently cited. The jury was told the following:

"I think that, instead of saying that any act done with intent to commit a felony and which causes death amounts to murder, it would be reasonable to say that any act known to be dangerous to life, and likely in itself to cause death done for the purpose of committing a felony which caused death, should be murder."

*Id.* at 313. Judge Stephen illustrated felony murder by hypothesizing a rape where the perpetrator chokes the victim in order to overpower her, but "without the least wish to kill her"; if death results, the crime is murder on the ground that "[i]f a man once begins attacking the human body in such a

way, he must take the consequences if he goes further than he intended when he began." *Id.*[12]

For decades the standard work on Maryland criminal law was L. Hochheimer, *The Law of Crimes and Criminal Procedure* (1897). Hochheimer cites *Reg. v. Serné, inter alia,* in support of the following description of the felony murder rule.

"The doing of a merely illegal act does not, apart from its likelihood (*under particular circumstances*) to cause death, affect the question of guilt, and a mere intent to commit a felony does not render a homicide murder. An act done for the purpose of committing a felony is murder, only if known to be dangerous to life and likely in itself to cause death. The old doctrine, that a mere intent to commit any felony renders a homicide murder is 'as much mistaken in law as it is repugnant to common sense and humanity' and would probably be repudiated by every modern tribunal."

*Id.* § 674, at 394 (footnotes omitted; emphasis added). *See also* MPJI–Cr § 14:17.7, *supra* n. 4; H. Ginsberg & I. Ginsberg, *Criminal Law and Procedure in Maryland* 94 (1940) (same) (citing *Reg. v. Serné* ).

The question before this Court was presented to the Supreme Court of Delaware in *Jenkins v. State,* 230 A.2d 262 (Del.1967). One of two defendants, Warner, had been convicted of second degree felony murder perpetrated while committing the statutory felony of fourth degree burglary by stealing from a junkyard. The night watchman at the junkyard had been killed in a struggle when he sought to apprehend Warner and his companion. Neither of the burglars was armed. The court, speaking through Justice Herrmann, initially held that the first degree murder statute did not abrogate second degree felony murder which had "long been recognized" in prior Delaware cases. *Id.* at 267. The court stated that "[w]ith the general trend toward mitigation in the severity of punishment for many felonies, and with the addition of many

---

**12.** In *Serné,* the defendant was charged with murder for allegedly setting a fire at the family home which resulted in his son's death. He was acquitted by the verdict of the jury.

statutory felonies of a character less dangerous than was typical of most common law felonies, the irrationality and unfairness of an unlimited felony-murder rule became increasingly apparent." *Id.* at 268. After reviewing the authorities, including *Reg. v. Serné, supra,* and *People v. Pavlic, supra,* the court concluded:

"The only rational function of the felony-murder rule is to furnish an added deterrent to the perpetration of felonies which, *by their nature or by the attendant circumstances,* create a foreseeable risk of death. This function is not served by application of the rule to felonies not foreseeably dangerous.... Moreover, application of the rule to felonies not foreseeably dangerous would be unsound analytically because there is no logical basis for imputing malice from the intent to commit a felony not dangerous to human life."

*Id.* at 268–69 (emphasis added).

Applying that standard to the facts in the case before it, the court concluded that burglary in the fourth degree "may, or may not, be foreseeably dangerous to human life, depending upon whether someone may be reasonably expected to be present in the building, and upon other circumstances of the case." *Id.* at 269. Inasmuch as the trial court had not instructed the jury to consider "the nature of the felony, [or] the circumstances of its commission," the conviction was reversed and the cause remanded for a new trial. *Id.*

A baby fifty-two days old was the victim in *State v. Stewart,* 663 A.2d 912 (R.I.1995). The cause of death was dehydration. On the mother's appeal from a second degree felony murder conviction, she contended that the underlying felony, there, "wrongfully causing or permitting a child under the age of eighteen to be a habitual sufferer for want of food and proper care," *id.* at 916, could not be the basis for felony murder because it was not inherently dangerous to life. The court observed that "[a] number of felonies at first glance would not appear to present an inherent danger to human life but may in fact be committed in such a manner as to be inherently dangerous to life," referring, for an example, to escape. *Id.* at

919. The court concluded that "[t]he proper procedure ... is to present the facts and circumstances of the particular case to the trier of fact and for the trier of fact to determine if a felony is inherently dangerous in the manner and the circumstances in which it was committed." *Id.* at 920. Based on its reading of the cases, the Rhode Island court concluded that only California and Kansas look to the elements of a felony in the abstract to determine dangerousness to life. *Id.* at 918.

Also factually somewhat analogous to the instant matter is *State v. Wallace*, 333 A.2d 72 (Me.1975). There the underlying felony was sodomy, and the victim was an eight year old boy. Asphyxiation was the cause of death. Noting the example of "consenting adults," the court recognized that "while force and violence are not necessarily involved in committing this crime, it may equally well be committed by the use of potentially deadly force ." *Id.* at 82. The test adopted by the Maine Supreme Court was whether the "manner or method of [the felony's] commission, or attempted commission, presents a serious threat to human life or is likely to cause serious bodily injury." *Id.* at 81.

Extortion was the underlying felony involved in the second degree murder conviction reviewed in *Commonwealth v. Matchett*, 386 Mass. 492, 436 N.E.2d 400 (1982). The defendant, a martial arts expert, had been hired to collect a $1,500 gambling debt from the victim, a man six feet four inches tall and weighing over 300 pounds. The defendant, carrying two handguns on his person, went to the victim's home. According to the defendant's testimony, the victim sought to strike the defendant with a lamp, at which point the defendant produced a handgun, leading to a struggle over the gun during which it discharged, killing the debtor. After a full review of the authorities the court agreed with the concurring opinion in the Pennsylvania case of *Bowden*, 309 A.2d at 719, to the effect that " 'the acts which constitute felonious conduct [must] possess a sufficient danger to human life to justify the application' " of the felony murder doctrine. *Matchett*, 436 N.E.2d at 410. The Massachusetts court recognized that "[t]here exist many statutory felonies which have no natural tendency to

cause death and are less serious than the common law felonies which gave rise to the rule." *Id.* In a holding limited to extortion, the court concluded that there could be no conviction of second degree felony murder "unless the jury [found] that the extortion involved circumstances demonstrating the defendant's conscious disregard of the risk to human life." *Id.* Inasmuch as extortion could be "committed in a way not inherently dangerous to human life," and inasmuch as the trial court had not instructed the jury consistently with the test which the Supreme Judicial Court of Massachusetts adopted, the case was remanded for a new trial. *Id.* at 410, 412.

For other cases in which the courts have looked to the circumstances under which the particular felony was committed in order to determine the danger to life, see *Ford v. State,* 262 Ga. 602, 423 S.E.2d 255, 256 (1992) (circumstances not inherently dangerous when felony is possession of firearm by convicted felon, and gun accidentally discharges through floor into apartment below while felon attempted to unload it); *People v. Golson,* 32 Ill.2d 398, 207 N.E.2d 68, 73–74 (1965) (theft by stealth of mail bags from post office platform; postal inspectors shot by thieves while attempting to escape; circumstances indicated defendants contemplated that violence might be necessary to carry out common purpose); *Commonwealth v. Ortiz,* 408 Mass. 463, 560 N.E.2d 698, 701 (1990) (although "carrying a firearm in a vehicle is not inherently dangerous (especially if the firearm is not loaded), the jury in any event reasonably could have found that the defendant in this case committed that crime with conscious disregard for the risk to human life ... presented by ... driving around with a loaded .357 Magnum revolver ... looking for an individual with whom [the defendant's] family had a longstanding feud"); *State v. Cole,* 542 N.W.2d 43, 53 (Minn.1996) (statutory felony of shoplifting by attempting to return stolen merchandise for cash; defendant armed; police officer shot and killed by thief; conviction affirmed because circumstances "involve[d] a special danger to life"); *State v. Harrison,* 90 N.M. 439, 564 P.2d 1321, 1324 (1977) (stating, in case involving false imprisonment, that underlying felony must be "inherently dangerous

or committed under circumstances that are inherently danger-ous"); *State v. Thompson,* 280 N.C. 202, 185 S.E.2d 666, 672 (1972) (stating in case involving burglary and larceny that underlying felony must be "inherently dangerous to human life, or foreseeably dangerous to human life due to the circum-stances of its commission"); *Griffin v. Commonwealth,* 33 Va.App. 413, 533 S.E.2d 653, 659 (2000) (suggesting that the court would look at the attendant circumstances by its rejec-tion of a "per se rule that the 'status offense' of possession of a firearm *may never* serve as the underlying felony for felony murder") (emphasis added); *State v. Noren,* 125 Wis.2d 204, 371 N.W.2d 381, 384 (1985) (robbery-striking victim three times with fist; abstract test rejected; test is "whether a reasonable jury could be convinced beyond a reasonable doubt that [defendant's] conduct was inherently dangerous"; person-al traits of victim considered).

Petitioners, on the other hand, urge that we adopt Califor-nia law on this issue. The Supreme Court of California "has long held the felony-murder rule in disfavor." *People v. Burroughs,* 35 Cal.3d 824, 201 Cal.Rptr. 319, 678 P.2d 894, 897 (1984) (in bank). That court has articulated the test of dangerousness to be "whether [the felony] possibly could be committed without creating [the peril of death]." *Id.* at 898. The California court "looks to the elements of the felony *in the abstract,* not the particular facts of the case, i.e., not to the defendant's specific conduct." *People v. Hansen,* 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, 1026 (1994) (in bank) (internal quotation marks omitted). *Burroughs* reversed a second degree felony murder conviction that was based on the offense of practicing medicine without a license, while *Hansen* (perhaps inconsistently) affirmed a felony murder conviction based on discharging a firearm at an inhabited dwelling house, where the statute defined "inhabited" to mean that it was currently used for dwelling purposes, whether occupied or unoccupied at the time of the shooting.

*People v. Caffero,* 207 Cal.App.3d 678, 255 Cal.Rptr. 22 (1989), applied *Burroughs* to a charge of felony murder based on child abuse. The *Caffero* court held that the statutory

"felony [of] child abuse is not inherently dangerous to human life and therefore not an appropriate predicate to application of the felony-murder rule." *Id.* at 23. The child abuse statute rendered the proscribed conduct felonious under circumstances or conditions likely to produce " 'great bodily harm or death.' " *Id.* at 25. In light of this disjunction, the *Caffero* court, relying on an analysis in *Burroughs,* determined that the child abuse statute could be violated by conduct likely to result in "great bodily harm," as distinct from death, and "even certainty of great bodily harm would not support an implication of inherent risk of death." *Id.* The court provided this example: "a fracture of a limb although deemed 'great bodily harm' is not likely to endanger the life of an infant, much less of a 17 year old." *Id.* For a similar decision, see *People v. Lee,* 234 Cal.App.3d 1214, 286 Cal.Rptr. 117 (1991). Both *Caffero* and *Lee* involved the deaths of premature infants due to neglect.

The *Burroughs* court justified the abstract approach on this basis:

"This form of analysis is compelled because there is a killing in every case where the rule might potentially be applied. If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous. We continue to resist such unjustifiable bootstrapping."

201 Cal.Rptr. 319, 678 P.2d at 897–98.

Nevada has adopted the abstract approach. *See Sheriff, Clark County v. Morris,* 99 Nev. 109, 659 P.2d 852, 859 (1983) (applying Nevada statute recognizing second degree felony murder, but requiring that the underlying felony be "one which is inherently dangerous when viewed in the abstract").

Kansas at one time followed the abstract approach. *See State v. Underwood,* 228 Kan. 294, 615 P.2d 153, 162–63 (1980) (holding that "in determining whether a particular collateral felony is inherently dangerous to human life so as to justify a charge of felony murder under [the Kansas felony murder statute], the elements of the collateral felony should be viewed in the abstract, and the circumstances of the commission of the felony should not be considered in making the determination"). That position, however, has been changed by the Kansas Supreme Court. *State v. Jacques,* 270 Kan. 173, 14 P.3d 409 (2000). By statute in Kansas, K.S.A. 21–3214(1), self defense is not available to a person who was attempting to commit a "forcible felony." In *State v. Mitchell,* 262 Kan. 687, 942 P.2d 1 (1997), the Kansas court had held that the sale of cocaine was a forcible felony, because the circumstances of the particular sale "showed the threat or use of physical force or violence against a person." *Id.* at 6. Then, in *Jacques,* also involving the "forcible felony"—self defense issue, that court said:

"In *Mitchell,* we looked beyond the 'abstract' elements of the crime and considered the facts and circumstances surrounding the commission of the crime. Had *Underwood* been decided after *Mitchell,* it is likely that it would have been decided differently."

*Jacques,* 14 P.3d at 417.[13]

Addressing the two schools of thought, LaFave and Scott conclude as follows:

"On principle, the [abstract] approach is incorrect, for if the purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct, then it would seem to make little difference whether the felony committed was dangerous by its very

---

13. *People v. Land,* 169 Ill.App.3d 342, 119 Ill.Dec. 955, 523 N.E.2d 711, 718–19 (1988), cited by petitioners, held that felony murder, under a statute limiting qualifying offenses to "forcible" felonies, could not be predicted on the offense of cruelty to children committed with a reckless state of mind, because a "forcible" felony required an intentional act.

nature or merely dangerous as committed in the particular case. If the armed robber is to be held guilty of felony murder because of a death occurring from the accidental firing of his gun, it seems no more harsh to apply the felony-murder doctrine to the thief whose fraudulent scheme includes inducing the victim to forego a life-prolonging operation. The requirement that the felony be 'inherently dangerous' is more understandable, however, if viewed as an attempt by some courts to limit what they believe to be 'a highly artificial concept that deserves no extension beyond its required application.' "

*Id.* § 7.5(b), at 624–25 (footnote omitted).

In our view the abstract approach undermines one of the primary purposes of the modern felony murder rule. The modern version of the rule is intended to deter dangerous conduct by punishing as murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill. If the felonious conduct, under all of the circumstances, made death a foreseeable consequence, it is reasonable for the law to infer from the commission of the felony under those circumstances the malice that qualifies the homicide as murder. The abstract approach, however, eliminates this inference merely because death is not a *necessary* consequence of the felony, *i.e.,* because the felony *could have been* committed in a non-mortally-dangerous manner.

The Maryland child abuse statute requires not simply physical injury, but that the injury be the "result of cruel or inhuman treatment" or the "result of a malicious act." § 35C(a)(2)(i). If an accused parent causes physical injury to a child of the degree required to constitute abuse under § 35C(a)(2)(i), but without intent to kill or to cause serious bodily harm, yet death results, then the *possibility* that some other parent might violate the child abuse statute without causing death should not prevent the law from inferring that the accused parent possessed the malice necessary to qualify the homicide as murder, precisely because death was a fore-

seeable consequence of the manner in which abuse was inflicted on the child victim.

The point made by the *Burroughs* court—that any felony will be found to be inherently dangerous where the circumstances of its commission include a dead body—is not bootstrapping, if one focuses on the foreseeability of death resulting from the nature of the felony or from the manner in which it was committed.

We join the apparent majority position and hold that the danger to life of a residual felony is determined by the nature of the crime *or* by the manner in which it was perpetrated in a given set of circumstances. In the instant matter we hold that child abuse of the character and degree described in the evidence in this case is inherently dangerous. Accordingly, the circuit court did not err in submitting to the jury second degree felony murder based upon child abuse.[14]

## IV

In this Part IV we discuss a discovery issue raised by the petitioners. Before trial, all of the defendants requested that the court disclose the address of Georgia Fisher, the surviving victim who testified for the State. The State previ-

---

14. Petitioners have not made any alternative argument that if we were to hold that second degree felony murder may be predicated on the child abuse in this case, the sentences for child abuse would merge into the sentence for second degree murder. Any such argument would implicate legislative intent, described in Part II, *supra* and the principles discussed in *Holbrook v. State,* 364 Md. 354, 374, 772 A.2d 1240, 1251–52 (2001) (declining to apply the rule of lenity when there is "clear legislative intent" that there be multiple punishments); *Whack v. State,* 288 Md. 137, 416 A.2d 265 (1980), *cert. denied,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981). *And see Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983); *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *Faraga v. State,* 514 So.2d 295, 302–03 (Miss.1987) (concluding that child abuse does not merge into murder because the statutes are designed to protect different societal interests); *State v. Williams,* 24 S.W.3d 101, 117 (Mo.App.2000) (rejecting argument that felony of endangering the welfare of a child merged into felony second degree murder based on legislative intent to limit merger doctrine by a statute excluding only murder and manslaughter as predicates for felony murder).

ously had furnished the defendants with dozens of pages of statements given by her to state agents, although not required by rule to do so. At a hearing on the request for the address, the defendants pointed out that they had "no means of getting in touch with [Georgia Fisher] to see whether or not we could gain access to her and speak with her." The defense wished not only to interview her concerning potential testimony but also to have her interviewed by a psychiatrist engaged by Rose Mary Fisher. The State represented to the court that Georgia Fisher "unequivocally does not wish to speak to any of the defense attorneys or any of their doctors." The State represented that Georgia Fisher had taken this position after having been advised that the decision was for her to make. The State revealed only that she was in "a secured, protected environment." When no defendant challenged the court's observation that it would be "foolish" to bring the child into court to confirm the State's representation, the court ruled that the witness's unwillingness to speak to representatives of the defense was the end of the matter.

On April 2, 1998, an attorney from the Legal Aid Bureau who represented Georgia Fisher wrote the trial court a letter in which she stated:

"I met with Georgia Fisher on Wednesday. At that time I asked Ms. Fisher if she would be willing to meet with any of the defendants, defendants' attorneys, defendants' investigators or defendants' experts in the above-referenced cases. My client stated unequivocally that she did not want to meet with any of these individuals."

Georgia Fisher's counsel sent copies of this letter to counsel for defendants. At trial, the defendants did not object to Georgia Fisher's testimony on the ground of a discovery violation by the State. Nor did the defendants move the court to ask Georgia Fisher, before she took the stand, if she would be willing to be interviewed by defendants' counsel outside the presence of the jury.

Here, the petitioners submit that the trial court's decision not to require disclosure of Georgia Fisher's address violated

Maryland Rule 4–263. That rule provides in pertinent part as follows:

"(b) **Disclosure upon request.** Upon request of the defendant, the State's Attorney shall:

"(1) Witnesses. Disclose to the defendant the name and address of each person then known whom the State intends to call as a witness at the hearing or trial to prove its case in chief or to rebut alibi testimony[.]

. . . .

"(i) **Protective orders.** On motion and for good cause shown, the court may order that specified disclosures be restricted . . . ."

We reject the petitioners' arguments because there was no substantive violation of Rule 4–263. Further, any violation, even if more than technical, was harmless beyond a reasonable doubt.

When the circuit court declined to grant the defense request for the address of Georgia Fisher, based upon the representations of the State which were shortly thereafter confirmed by counsel for Georgia Fisher, the circuit court in substance was granting a protective order to the effect that the State need not furnish the address of the victim-witness. Although, from a formal standpoint, there was no motion made for a protective order, that is not decisive. As Judge Wilner pointed out, writing for the Court in *Raynor Assoc. L.P. v. Baltimore Door & Frame Co.,* 357 Md. 303, 744 A.2d 25 (2000),

"the law generally is that, unless a statute or rule expressly, or by necessary implication, provides otherwise, a court may ordinarily do on its own initiative what it may do on motion of a party, at least where the party benefitted by the action is not likely to oppose or be prejudiced by it."

*Id.* at 315, 744 A.2d at 32. Here, in addition, the background facts supply ample good cause for the court's conclusion that the secure and protected environment of this child should not be invaded. There was no abuse of discretion.

■■■ In any event, even if one were to conclude that Rule 4–263 was violated, once Georgia Fisher's counsel advised the defendants that Georgia was unwilling to speak with defense representatives, defense counsel were under an ethical obligation not to contact Georgia Fisher without her counsel's consent. Maryland Rule of Professional Conduct 4.2 ("Communications with person represented by counsel") provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The comment to Rule 4.2 states that it "also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question." *See* C.W. Wolfram, *Modern Legal Ethics* § 11.6.2, at 611 n. 33 (1986) (noting that the term "party" in this context is "intended to refer broadly to any 'person' represented by a lawyer in a matter").

In 2 G.C. Hazard, Jr. & W.W. Hodes, *The Law of Lawyering* (Supp.1998), the authors note that Rule 4.2 applies to criminal defense lawyers, so that "when a witness is represented by his own counsel in the matter, the witness must be approached only through that counsel. In any event, it should be remembered that a witness, represented or not, may choose to decline to be interviewed." *Id.* § 4:2:111, at 744.17. The defense attorneys in this case also were not "authorized by law" under the terms of Rule 4.2 to interview Georgia Fisher because "witnesses [to a criminal case] may refuse to be interviewed. Indeed, a defendant's right to access is tempered by a witness' equally strong right to refuse to say anything." *United States v. Medina,* 992 F.2d 573, 579 (6th Cir .1993) (citation omitted).

There is simply no indication in this record that Georgia Fisher ever changed her mind or that defense counsel ever sought again to obtain her counsel's consent after that consent initially was denied. Nor is there any basis for believing that a result of furnishing the address of the witness would have

been that her trial testimony would have been other than it was. There is no prejudice.

## V

■ We now consider an argument advanced solely by Rose Mary Fisher (in this Part V, "Fisher") that psychological profile evidence was erroneously excluded. In her direct examination at trial Fisher was asked a number of questions in a variety of ways in an attempt to elicit that Fisher herself had been a victim of child abuse by her stepfather. Objections were sustained to most of these questions, prompting Fisher's counsel to request a conference at the bench. Counsel asserted that evidence of years of physical and sexual child abuse was relevant because "[i]t would have a specific effect upon her forming an intent to hurt somebody[—]about what *she believes* is abuse or what *she doesn't believe* is abuse" (emphasis added). The court said that Fisher was arguing diminished capacity which is not recognized in Maryland. *Hoey v. State,* 311 Md. 473, 536 A.2d 622 (1988); *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982). Counsel denied this characterization, contending that the case concerned specific intent crimes. The court ruled that Fisher was arguing that "she doesn't have the ability to appreciate the criminality of her conduct" and that it was a diminished capacity defense.

Fisher testified that she was not aware of some of the abuse described in the evidence and that she did not believe the conduct of which she was aware to be harmful. She said she saw Scarpola spank the children but never saw him punch or kick them. She knew that the basement of the home was used to discipline Rita and Gloria, but she never personally observed what occurred there. She denied beating the girls, but admitted that she once struck Georgia on the buttocks with a yardstick when the child had stolen some money. Fisher acknowledged that she knew that the girls were regularly locked in their bedroom. She admitted to locking Georgia in "the hole" on one occasion. She never told anyone not to give the children food. On the occasion when Scarpola had bloodied Georgia's head by striking her with a large flashlight in

the bedroom shared by Fisher and Scarpola, Fisher saw the head wound and cleaned the blood up from the bedroom floor, but did not know how Georgia "hit her head." As to each instance of "disciplining" the children in which Fisher either engaged or of which she admitted knowledge, Fisher testified that she had no intent to injure or harm the girls or that she did not believe the conduct was harmful.

When Fisher left the stand, the court took up the question of testimony from her expert in psychology, Dr. Williamson. Fisher made an extensive proffer that covered the following points. Dr. Williamson's testimony would be based on a complete history taken from Fisher, review of her school records, medical transcripts, records of Social Services, police reports, and psychological and psychiatric records. In addition the proffered witness reviewed some 1,500 pages of discovery that had been furnished by the State to Fisher. He was aware that Fisher had testified to some participation in the charged conduct. He would testify that Fisher suffers from major depression and has the abnormal personality trait of a passive personality.

The proffer continued:

"And yet that Miss Fisher claims that she was unaware that her sisters were in any way being seriously harmed, that *she denied an intent to do harm* to either of her sisters in any of these acts or anything that she observed going on in the household.

"And [Dr. Williamson] would testify that based upon her psycholog[ical] profile, which is a combination of her mental illness and basic personality and her history of abuse that these claims are consistent with someone who suffers, who has such a personality profile. And he would state his reasons upon which he bases those conclusions."

(Emphasis added).

The court excluded the proffered testimony, saying:

"In this case Miss Fisher just testified. She didn't testify that she was under the control and domination of Mr. Scarpola. She said that the events that the State alleges

that Mr. Scarpola did she never saw. She was unaware of. Didn't happen in her presence. She didn't know about. She says that she was unaware of all of the abuse that was going on. If it went on. She was unaware that Rita and Georgia were beaten on a regular basis and that they were regularly subjected to the abuse. She got on the stand and said, I wasn't under his domination and control. I didn't know anything about it. It didn't happen, as far as I am concerned."

Based on that view of the record, the circuit court held that the proffered evidence of Fisher's psychiatric profile would have no relevance. The Court of Special Appeals held that the exclusion was within judicial discretion. *Fisher,* 128 Md. App. at 153–56, 736 A.2d at 1164–65. In this Court Fisher contends that the evidence was admissible because it tended to negate the mens rea element of child abuse.

It is well settled that a psychiatrist may not opine "concerning the defendant's actual intent at the time of the offense." *Hartless v. State,* 327 Md. 558, 573, 611 A.2d 581, 588 (1992). *See also Simmons v. State,* 313 Md. 33, 47–48, 542 A.2d 1258, 1265 (1988); *Johnson v. State,* 303 Md. 487, 515, 495 A.2d 1, 15 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). *Simmons* and *Hartless* also addressed psychiatric profile evidence.

Simmons was convicted of second degree murder. He claimed imperfect self-defense. After the trial court had properly excluded a proffered psychiatric opinion that Simmons in fact subjectively believed that the use of fatal force was necessary to prevent his imminent death or serious bodily harm, the defense argument dropped down a notch. Simmons proffered that he would testify to his belief and that the psychiatrist would testify that his "asserted subjective belief would be consistent with his psychiatric profile." *Simmons,* 313 Md. at 36, 542 A.2d at 1259. The trial court concluded that the evidence could not be admitted because it would usurp the function of the jury. *Id.* at 40, 542 A.2d at 1261. We held that this was error and said that "the proffered

testimony has some relevance in that consistency between the specific subjective belief testified to by Simmons and Simmons's psychological profile tends to make it more likely that Simmons in fact held that subjective belief." *Id.* at 48, 542 A.2d at 1265.

In *Hartless*, the accused was convicted of premeditated first degree murder and other offenses. He had proffered, unsuccessfully, what he labeled as psychiatric profile evidence. The proffer included " '[t]hat the defendant was under a tremendous amount of stress from his father and the background of the defendant in relating to that[.]' " *Hartless*, 327 Md. at 575, 611 A.2d at 589. Unlike the ruling as a matter of law that the trial judge in *Simmons* had made, the circuit court in *Hartless* recognized potential admissibility, but exercised its discretion to exclude the proffered evidence. We affirmed. The trial court's probing of the proffer led the court to conclude that the proffered opinion would be based on facts that were not in evidence. Indeed, the asserted psychological profile opinion appeared to be an effort to get the defendant's version of the facts before the jury, although that version was not in evidence. *Id.* at 580–81, 611 A.2d at 591–92. Further, the profile was directed to showing the dependence of the accused on his father-in-law, who was in jail at the time of the murder, so that the profile bore little nexus to the defense of lack of an intent to kill. *Id.* at 580, 611 A.2d at 591–92.

Here, Fisher contends that this case is controlled by the principle set forth in *Simmons*. We disagree. As we shall demonstrate below, the mens rea of child abuse does not involve an accused's subjective belief. Child abuse is a general intent crime, and its mens rea requires only intentionally acting or failing to act under circumstances that objectively meet the statutory definition of abuse.

The parties agree that our inquiry begins with *Bowers v. State*, 283 Md. 115, 389 A.2d 341 (1978). Bowers was charged with violating Maryland Code (1957, 1976 Repl.Vol.), Art. 27, § 35A which, in relevant part, defined "abuse" to mean:

"[Any] physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts by any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for supervision of a minor child."

§ 35A(b)7(A). In answer to a contention that the child abuse statute was void for vagueness, this Court looked to the antecedent common law dealing with parental discipline of children. We said:

"Long before the advent of contemporary child abuse legislation, it was a well-recognized precept of Anglo–American jurisprudence that the parent of a minor child or one standing *in loco parentis* was justified in using a reasonable amount of force upon a child for the purpose of safeguarding or promoting the child's welfare. . . . So long as the chastisement was moderate and reasonable, in light of the age, condition and disposition of the child, and other surrounding circumstances, the parent or custodian would not incur criminal liability for assault and battery or a similar offense."

*Bowers*, 283 Md. at 126, 389 A.2d at 348 (citations omitted).

Continuing its description of the common law rule, the opinion in *Bowers* stated:

"On the other hand, where corporal punishment was inflicted with 'a malicious desire to cause pain' or where it amounted to 'cruel and outrageous' treatment of the child, the chastisement was deemed unreasonable, thus defeating the parental privilege and subjecting the parent to penal sanctions in those circumstances where criminal liability would have existed absent the parent-child relationship."

*Id.*

We concluded:

"Thus, the terminology employed in Article 27, § 35A(b)(7)(A) appears to be nothing but a codification of the common law principles concerning the limits of permissible parental chastisement. Since the contours of the common law privilege have been subject for centuries to defini-

tion and refinement through careful and constant judicial decision-making, terms like 'cruel or inhumane' and 'malicious' have acquired a relatively widely accepted connotation in the law."

*Id.* at 127, 389 A.2d at 348.

■ Fisher argues that the proffered psychological profile evidence is relevant to the alternative form of physical child abuse, namely, physical injury as a result of a malicious act.[15] *Bowers* clearly establishes a totality of the circumstances test for determining when parental discipline crosses the line from moderate and reasonable chastisement to criminal child abuse. That type of test is typically an objective standard.

■ The testimony of Fisher on which the relevancy of the proffered psychological opinion evidence is based must be viewed in the light of the above-described parental discipline privilege. Even a reasonable spanking of a child for disciplinary purposes inflicts pain and, in a physical sense, harms or injures the child. But it is not a legally recognized harm or injury. When Fisher testified that she had no intent to harm or injure the children, she necessarily was referring to her asserted belief that the beatings were proper discipline and that there was no legally recognized harm or injury. The malice, however, that is an element of physical injury child abuse looks to the objective facts of the intended conduct and not to the subjectively perceived result. In this respect, the malice of the act proscribed by § 35C is similar to implied malice in the law of murder, except that the natural tendency of the intended act or omission need not be death or great bodily harm. *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974), articulates the concept.

"Malice is an indispensable ingredient of murder—whether it be murder in the first or second degree; such malice may be express or implied. *Stansbury v. State,* 218 Md.

15. The circuit court instructed in the alternative, saying that the physical injury could be the result of cruel or inhumane treatment or as a result of a malicious act. There was no special verdict distinguishing between the two types of physical injury child abuse.

255, 260, 146 A.2d 17, 20 (1958). As relating to murder it has been defined 'as the intentional doing of a wrongful act to another without legal excuse or justification' and as including 'any wrongful act done wilfully or purposely.' *See Chisley v. State,* 202 Md. [87,] 105, 95 A.2d [577,] 585 [ (1953) ]. *See also Lindsay v. State,* 8 Md.App. 100, 104, 258 A.2d 760, 763 (1969), *cert. denied,* 257 Md. 734 (1970). 'In the absence [of evidence] of justification, excuse, or some circumstance of mitigation, malice may be inferred when there is an intent to inflict great bodily harm or when one wilfully does an act, the natural tendency of which is to cause death or great bodily harm.' *Faulcon v. State,* 211 Md. [249,] 257, 126 A.2d [858,] 862 [ (1956) ]. Our predecessors have held '[a]n actual intent to take life is not necessary for a conviction of murder if the intent is to commit grievous bodily harm and death occurred in consequence of the attack.' *Davis v. State,* 237 Md. 97, 104, 205 A.2d 254, 258 (1964), *cert. denied,* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965); *Webb v. State,* 201 Md. 158, 93 A.2d 80 (1952). Thus, under our decisions, since the malice required for murder may be either express or implied, there is no requirement that a specific intent to kill, and thus express malice, exist; a person may commit murder without an actual intent to kill (express malice) for the law will infer or imply malice from the attendant circumstances in some unintentional killings. *See Cook v. State,* 9 Md.App. 214, 218, 263 A.2d 33, 35, *cert. denied,* 258 Md. 726 (1970); *Lindsay v. State, supra.*"

*Id.* at 388, 330 A.2d at 179.

Further reinforcing construction of the definition of physical injury child abuse, presently Article 27, § 35C(a)(2)(i), to require the above-described type of malice is the fact that the definition of abuse does not contain a phrase such as "with intent to" which is a common signal of legislative intent to require a specific state of mind. On this aspect *Shell v. State,* 307 Md. 46, 512 A.2d 358 (1986), is instructive. There, relying on *Smith v. State,* 41 Md.App. 277, 305, 398 A.2d 426, 442, *cert. denied,* 284 Md. 748 (1979), this Court stated what is ordinari-

ly the distinction between specific intent crimes and general intent crimes as follows:

> " 'A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods. . . .

> " 'The larger class "specific intent" includes such other members as 1) assault with intent to murder, 2) assault with intent to rape, 3) assault with intent to rob, 4) assault with intent to maim, 5) burglary, 6) larceny, 7) robbery and 8) the specific-intent-to-inflict-grievous-bodily-harm variety of murder. Each of these requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result.' "

307 Md. at 62–63, 512 A.2d at 366.

█ In a portion of our opinion in *Bowers* contrasting criminal child abuse with privileged discipline, reference is made to " 'a malicious desire to cause pain.' " *Bowers,* 283 Md. at 126, 389 A.2d at 348. The reference is an illustration and not a limitation. One way in which the parental privilege can be lost (or, more accurately, does not even arise) is where the battery is inflicted on the child with no purpose of enforcing parental discipline. The concept is well explained by Judge Moylan, writing for the Court of Special Appeals in

*Anderson v. State,* 61 Md.App. 436, 487 A.2d 294, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985), as follows:

"The common law notion of privileged force as a defense to what would otherwise be assault and battery has two clear limitations. The first, so taken for granted that it tends to be neglected by the case law and legal literature, is that the force truly be used in the exercise of domestic authority by way of punishing or disciplining the child-for the betterment of the child or promotion of the child's welfare-and not be a gratuitous attack.[10]

---

10....

"Thus, the very question of whether the force employed is sufficiently moderate to be privileged only has pertinence when the other necessary precondition to the privilege is also present-that the force, moderate or immoderate, is being applied for purposes of chastising or punishing the child. Although instances of such depraved behavior will be rare, the hypothetical possibility nonetheless exists of one *in loco parentis* assaulting and beating a minor child outside any suggested context of punishment or chastisement. In the case of such gratuitous and not even arguably justifiable attack, the assailant is guilty of assault and battery whether the force employed is moderate or immoderate. In this context, the parent or custodian stands as a legal stranger in relation to the child and not within any privileged status."

*Id.* at 444–45, 487 A.2d at 298.

Here, the issue before us is the exclusion of proffered psychological opinion evidence and not the sufficiency of the evidence. Thus, although the jury might have inferred from the circumstances that Fisher's purpose was to inflict pain for pain's sake, the opinion evidence was proffered to support Fisher's testimony that she had no intent to harm the children. In the instant case the defense was that the privilege was not exceeded. Simply because the offense may be committed in another, non-exclusive way, *i.e.,* by battery that has no disciplinary purpose, it does not follow that an excessive

discipline battery cannot be child abuse. Whether the purported disciplinarian went too far is determined by the objective facts. Consequently, the reference in *Bowers* to " 'a malicious desire to cause pain' " is to a form of child abuse that is not relevant to the defense in the instant matter.

Fisher cites *Shell,* 307 Md. 46, 512 A.2d 358, and *Brown v. State,* 285 Md. 469, 403 A.2d 788 (1979), where the term, "maliciously," in the statutes respectively involved was construed to require a subjective intent to harm. In *Brown,* the owner of a dilapidated building burned it in order to save demolition costs as part of a plan to replace the structure. This Court reversed Brown's conviction of having violated Maryland Code (1957, 1976 Repl.Vol., 1978 Cum.Supp.), Art. 27, § 7 which proscribed "wilfully and maliciously set[ting] fire to ... any ... building, whether the property of himself or of another...." We noted that "[a] majority of courts in other jurisdictions which have analyzed the term 'malice' in an arson context" had generally concluded "that a malicious act is one intended to bring harm to another person." *Brown,* 285 Md. at 474, 403 A.2d at 791. Under the facts in *Brown* there was no person who was harmed so that the evidence was legally insufficient. *Id.* at 475, 403 A.2d at 792. *Brown* further reasoned that, inasmuch as "wilfully" is commonly interpreted as meaning "intentionally," the term "maliciously" would be surplusage if it were not given a meaning different from "wilfully." *Id.*

*Shell* was a prosecution for "wilfully and maliciously destroy[ing] ... any real or personal property of another...." Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 111. The defense was voluntary intoxication, to a degree negating the mens rea of the crime. Relying on *Brown,* and on precedents involving destruction of property charges under § 111, we concluded that that statute required "both a deliberate intention to injure the property of another and malice." *Shell,* 307 Md. at 68, 512 A.2d at 369. We said that the offense should be "characterized as a specific intent offense" so that voluntary intoxication was a defense. *Id.*

■ *Brown* and *Shell* are distinguishable from the instant matter. In those cases the statutes involved proscribed "wilfully and maliciously" engaging in the proscribed conduct. Under the child abuse statute there are no compound adverbs to each of which some meaning must be given. Fisher's argument rests solely on the words, "a malicious act." More important, and unlike the statutes concerned with the protection of property that were involved in the *Brown* and *Shell* cases, the criminal child abuse statute is concerned with protecting the person of infants and minors from physical injury at the hands of those responsible for their welfare. It is more consistent with that legislative purpose to construe "malicious act" as measuring the mental state of the alleged abuser by an objective rather than by a subjective standard.

Further, if "malicious act" in the child abuse statute were construed to require a specific intent to abuse, then voluntary intoxication could be a defense to the crime. It is inconceivable that the General Assembly intended that defense to apply to physical injury, or sexual, child abuse.

Substantially in accord with the view above expressed is *Bruce v. State,* 96 Md.App. 510, 625 A.2d 416 (1993). Bruce had been convicted of physical injury child abuse and, on appeal, challenged the trial court's instruction on state of mind. Initially the trial court had instructed that "[c]ruel or inhumane treatment or a malicious act means conduct or force beyond that which is reasonable or appropriate for the child when considering all of the surrounding circumstances." *Id.* at 522–23, 625 A.2d at 422. Defense counsel excepted, requesting that the required mens rea be described as a " 'willful and malicious desire' " and that the jury be told that actual malice refers to " 'an evil state of mind.' " *Id.* at 523, 625 A.2d at 422. The Court of Special Appeals held there was no error and approved the following supplemental instruction that had been given:

" 'Cruel or inhumane treatment or a malicious act means contact or force beyond that which is reasonable or appropriate for the child.

" 'When considering all of the surrounding circumstances, the defendant must have intended in inflicting the physical injury as a result of cruel or inhumane treatment, his actions. In other words, he must have intended what he did.' "

*Id.* at 523, 625 A.2d at 422–23.[16]

Moreover, the legislative history of § 35C supports rejection of a subjective intent to harm as an element of the crime. In 1983, after the decision in *Bowers,* the General Assembly amended the definition of physical injury abuse, then found in Article 27, § 35A(b)7(A) by adding that the cruel or inhumane treatment or malicious act be "under circumstances that indicate that the child's health or welfare is harmed or threatened thereby." Chapter 492 of the Acts of 1983. The title to the bill that became Chapter 492 states that the purpose of the amendment to the definition of abuse was "expanding the scope of the child abuse statute to include children who are in potential danger." *Id.* Potential danger arises from conduct that exceeds the discipline privilege, without regard to whether the one *in loco parentis* believes the discipline to be moderate and reasonable.[17]

---

16. We observe that the pattern jury instruction on child abuse by physical injury does not contain any description of the state of mind of the accused beyond that which might be implicit in "a malicious act." *Maryland Criminal Pattern Jury Instructions,* MPJI–Cr § 4:07, at 161 (MICPEL Supp.1999).

17. Chapter 492 of the Acts of 1983 made the same amendment in the definition of abuse that is currently codified as Maryland Code (1984, 1999 Repl.Vol.), § 5–701(b)(1) of the Family Law Article. That definition applies to Subtitle 7 entitled, "Child Abuse and Neglect." A contemporaneous practical construction of the amended definition was made by the Department of Human Resources in its memorandum to the Judiciary Committee of the House of Delegates in support of House Bill 1395 which became Chapter 492. That memorandum in relevant part reads:

"HB 1395 clarifies our current definitions of child abuse and neglect to specify that for purposes of identifying an abused or neglected child the state consider the potential harm to the safety or well-being of the child created by the actions or inactions of the child's caretakers. This is clarifying language. The other substantive provisions of the definitions, specifically, in abuse that there be

 There is no inconsistency between the views above
expressed and those in *State v. Taylor,* 347 Md. 363, 701 A.2d
389 (1997), which is also cited by Fisher. In *Taylor* we
approved the consolidation for trial of five physical injury child
abuse charges involving the same victim. There we said that
"[i]ntent to cause physical injury and malice were important
elements of the State's case." *Id.* at 372–73, 701 A.2d at 394.
That statement in *Taylor* is a paraphrase of a sentence from
*State v. Bowers* that had previously been set forth with
emphasis in *Taylor*—" 'Only when the line is crossed and
physical injury is *intentionally* and *maliciously* or *cruelly
inflicted* does criminal responsibility attach.' " *Id.* at 372, 701
A.2d at 393. The injury must be intentional in the sense that it
is non-accidental and it must be malicious in the sense that the
degree of punishment exceeds justification and destroys the
privilege.

For the foregoing reasons the psychiatric opinion evidence
that was proffered for the purpose of bolstering Fisher's
description of her subjective intent was irrelevant. There was
no error.

## VI

The remaining issue for our consideration involves the
sentence imposed under the second count of the indictment
against Utley for child abuse of Rita on June 24 and June 25,
1997. In relevant part that count charged that Utley "did
unlawfully cause abuse to said Rita Denise Fisher; contrary to
the form of the Act of Assembly.... (Child Abuse—Art. 27,
Sec. 35C)." The circuit court imposed a twenty year sentence
on Utley under Count II to run concurrently with the thirty
year sentence imposed on Count I for felony murder in the
second degree. When Rita was killed, § 35C(b)(1) authorized
a maximum sentence of fifteen years for child abuse and
§ 35C(b)(2) authorized a maximum sentence of twenty years if

evidence of injury or sexual abuse, and in neglect, that there be
evidence of physical or mental harm or injury, still must be met in
determining whether maltreatment has occurred."

the abuse resulted in the death of the victim. Advancing both constitutional and common law arguments, Utley contends that her sentence on Count II could not exceed fifteen years.[18] The issue is one that was embraced within the questions that we directed the parties supplementally to brief and to reargue.

 Utley's point is well taken as a matter of Maryland criminal cause pleading, so that it is unnecessary for us to address constitutional arguments. We have held in Part II, *supra*, that § 35C(b)(2) does not create a crime separate from child abuse as proscribed by § 35C(b)(1); rather, the former provides for enhancing the penalty for the offense described in the latter. Much the same penalty structure is found in § 286 where subsection (a)(1) makes it unlawful, *inter alia*, to possess a controlled dangerous substance with intent to distribute. Subsections (f)(1)(ii) and (f)(3) provide that, if the substance is 448 grams or more of cocaine, then "it is mandatory upon the court to impose no less than 5 years' imprisonment," with limitations on probation and parole. § 286(f)(3). *Wadlow v. State*, 335 Md. 122, 642 A.2d 213 (1994), involved the interplay between subsections (a) and (f) of § 286.

Count I of the indictment against Wadlow charged possession with intent to distribute " 'over 448 grams of cocaine, in violation of Article 27, Section 286(a)(1) . . . .' " 335 Md. at 126, 642 A.2d at 215. No count of the indictment charged a violation of § 286(f). We held that a sentence of four years imposed on Wadlow under Count I could not be increased to five years on the following rationale:

"In Maryland, however, we have generally drawn a distinction between sentence enhancement provisions that depend upon prior conduct of the offender and those that depend upon the circumstances of the offense. In the former situation, involving recidivism, we have made it clear that determination of the requisite predicate facts is for the sentencing judge.

---

18. The constitutional argument is based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

. . . .

"In the latter case, however, where the Legislature has prescribed different sentences for the same offense, depending upon a particular circumstance of the offense, we have held that the presence of that circumstance must be alleged in the charging document, and must be determined by the trier of fact applying the reasonable doubt standard."

335 Md. at 128–29, 642 A.2d at 216 (footnote omitted).

In *Wadlow* we analogized to robbery, pointing out that it "is ordinarily characterized as one offense, with the division between armed robbery and simple robbery being for the purpose of punishment, but the charge must be specific and the determination of the seriousness of the offense is for the trier of fact." *Id.* at 129, 642 A.2d at 216 (citation omitted).

After discussing common law larceny and malicious destruction of property, both crimes where sentence enhancement was or is based upon the value of the property taken or destroyed, we concluded:

"Accordingly, when the State seeks the enhanced penalties provided by § 286(f) it must allege the necessary fact concerning the amount [of controlled dangerous substance], and prove that fact beyond a reasonable doubt. The citation of the statute at the end of the count seeking enhanced penalties under subsection (f) would properly refer to Art. 27, § 286(a)(1) & (f), although a reference to Art. 27, § 286(f) alone would be sufficient, and if the State did not elect to include a separate count charging only a violation under § 286(a)(1), that charge would nevertheless be available as a lesser included offense under a count charging the offense and the additional circumstance of subsection (f)."

*Id.* at 132, 642 A.2d at 218 (footnote omitted).

In the instant matter Count II of the Utley indictment did not allege the fact that the State needed to prove in order to enhance the penalty, *i.e.*, that the abuse caused death. Nor does the general reference at the conclusion of Count II to § 35C cure the problem, inasmuch as that reference gives no

notice whether the State is seeking the enhanced penalty under § 35C(b)(2).

For these reasons the judgment of conviction as to Utley will be vacated as to Count II only and the matter remanded for re-sentencing on that count.[19]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMING THE JUDGMENT OF CONVICTION OF THE PETITIONER, MARY UTLEY, AFFIRMED IN PART AND VACATED IN PART, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO VACATE ONLY THAT PART OF THE JUDGMENT OF CONVICTION AGAINST MARY UTLEY REPRESENTED BY THE SENTENCE ON COUNT II OF THE INDICTMENT, AND TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR RE-SENTENCING ON COUNT II OF THE INDICTMENT.*

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMING THE JUDGMENT OF CONVICTION OF ROSE MARY FISHER AFFIRMED.*

*COSTS TO BE PAID IN THEIR RESPECTIVE CAUSES BY THE PETITIONERS, MARY UTLEY AND ROSE MARY FISHER,*

BLOOM, Judge, Concurring and Dissenting.

I concur with most of the holdings of, and the reasons expressed in, the majority opinion. Specifically, I agree that Maryland recognizes the common law doctrine of felony murder applicable to unintended homicides in the perpetration of felonies other than those listed in the first degree murder statute; that statutory as well as common law felonies that are dangerous to life may be predicate felonies for second degree felony murder; that in determining whether a particular

---

**19.** Although the result that we reach may be required as a matter of due process, see *Apprendi,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, we need not place our decision on constitutional grounds, in view of the Maryland common law.

felony is sufficiently dangerous to life to be a predicate felony for second degree murder, the courts must look to the manner in which the felony was committed, rather than to the "abstract elements of the crime;" that child abuse, when committed in a manner inherently dangerous to life, as in this case, may be a predicate felony for second degree felony murder; that the trial court did not err in refusing to require the State to disclose Georgia Fisher's whereabouts to petitioners; and that the trial court did not err in excluding Rose Mary Fisher's proffered "psychological profile" evidence.

I respectfully dissent, however, from those portions of the majority opinion, and that part of the mandate, that affirm the judgment of the Court of Special Appeals insofar as that judgment affirms the sentences imposed on petitioners Utley and Fisher for child abuse of Rita Fisher. I believe that those sentences are barred by Maryland common law principles of double jeopardy and merger, as well as by the Double Jeopardy Clause of the Fifth Amendment, which was made applicable to state prosecutions by the Due Process Clause of the Fourteenth Amendment.

What the Double Jeopardy Clause of the Fifth Amendment provides is that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." In *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court announced a rule for determining whether two offenses are the same offense for double jeopardy purposes:

> The applicable rule is that when the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.[20]

The *Blockburger*, or required evidence test, is now well settled Maryland law. *Jones v. State*, 357 Md. 141, 163–64,

---

**20.** The test set forth in *Blockburger* had actually been applied by the Supreme Court more than forty years earlier in *In re Nielsen*, 131 U.S. 176, 186–88, 9 S.Ct. 672, 675–76, 33 L.Ed. 118 (1889).

742 A.2d 493 (1999); *State v. Lancaster,* 332 Md. 385, 391, 631 A.2d 453 (1993); *Biggus v. State,* 323 Md. 339, 350, 593 A.2d 1060 (1991); *Snowden v. State,* 321 Md. 612, 616, 583 A.2d 1056 (1991). The required evidence test applies to both common law and statutory offense. *Williams v. State,* 323 Md. 312, 317, 593 A.2d 671 (1991); *Snowden,* 321 Md. at 617, 583 A.2d 1056. In *Thomas v. State,* 277 Md. 257, 267, 353 A.2d 240 (1976), quoted in *State v. Ferrell,* 313 Md. 291, 298, 545 A.2d 653 (1988), Judge Eldridge, writing for the Court explained:

> The required evidence is that which is minimally necessary to secure a conviction for each statutory offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy purposes even though arising from the same conduct or episode. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy purposes.

*Id.* at 298, 545 A.2d 653 (citation omitted); *see Lancaster,* 332 Md. at 391–92, 631 A.2d 453; *State v. Jenkins,* 307 Md. 501, 517, 515 A.2d 465 (1986). On that basis, in *Gianiny v. State,* 320 Md. 337, 577 A.2d 795 (1990), the Court held that payment of a pre-set fine for negligent driving, as an alternative to appearing for trial on that charge, barred a subsequent trial on a charge of manslaughter by automobile because payment of the fine constituted a conviction (Md.Code, 1957, 1987 Repl.Vol., § 11–110(a)(4) of the Transportation Article), of the lesser included offense of negligent driving.

The protection against double jeopardy for the same offense, under Maryland common law as well as under the Fifth Amendment, is not limited to "classic" double jeopardy, *i.e.,* successive prosecutions, which were formerly addressed by the pleas in bar of *autrefois convict* and *autrefois acquit,* but also prohibits multiple punishments for the same offense in a single prosecution. *U.S. v. Wilson,* 420 U.S. 332, 342–43, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975); *North Carolina v.*

*Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *Newton v. State,* 280 Md. 260, 263, 373 A.2d 262 (1977).

In a single prosecution, if, under the required evidence test two offenses are deemed to be the same for double jeopardy purposes, merger follows as a matter of course, *Lancaster,* 332 Md. at 411–12, 631 A.2d 453, and the offense having the fewer required elements—the lesser included offense—merges into the greater offense, *i.e.,* the offense having the greater number of required elements, even if the lesser included offense carries a greater permissible sentence than the greater offense does. Thus, in *Lancaster,* a conviction for Unnatural or Perverted Sexual Practice (fellatio), under Md.Code (1957, 1992 Rcpl.Vol.), Article 27, § 554, which carried a maximum sentence of ten years, merged into conviction for Fourth Degree Sexual Offense, as proscribed by Art. 27, § 464C(a)(2), with a maximum sentence of one year, based on the defendant's commission of a sexual act (fellatio) upon a person fourteen or fifteen years of age, the defendant being more than four years older than the victim. Likewise, solicitation of murder merged into being an accessory before the fact to the same murder, *Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979); in companion cases, kidnapping and robbery merged into felony murders, *State v. Frye* and *Jones v. State,* 283 Md. 709, 393 A.2d 1372 (1978); attempted robbery merged into felony murder, *Newton v. State, supra;* common law assault merged into common law rape, *Green v. State,* 243 Md. 75, 220 A.2d 131 (1966); common law larceny merged into the statutory offense of breaking and stealing, *Tucker v. State,* 237 Md. 422, 206 A.2d 691 (1965).

As Judge Eldridge, writing for this Court in *Newton,* explained, in order to secure a conviction for murder under the felony murder doctrine, the State must prove the underlying felony plus the additional fact that the death of the murder victim occurred in the perpetration of that felony. The felony, therefore, is an essential ingredient of the murder conviction. The only additional fact necessary to secure the felony murder conviction that is not necessary to secure a conviction for the underlying felony is proof of the death. The evidence needed

to secure the felony murder conviction is, absent the proof of death, the same evidence required to prove the underlying felony. Therefore, as only one offense (murder) requires proof of a fact that the other (the underlying felony) does not, under the required evidence test the underlying felony and the murder merge. *Newton*, 280 Md. at 269, 373 A.2d 262.

If the murder conviction, however, is premised upon independent proof of wilfulness, premeditation, and deliberation (first degree murder), or an intent to kill without any necessary consideration of premeditation or deliberation (second degree interntional murder), or an intent to inflict grievous bodily harm (second degree murder), or, in the language of Maryland Criminal Pattern Jury Instructions (MPJI Cr 4:17.8), proof that the defendant's conduct that caused the death of the victim and that the defendant, conscious of such risk, acted with extreme disregard of the life endangering consequences (second degree depraved heart murder), the offense would not merge because each offense would then require proof of a fact that the other did not. *Id.*

Petitioners, unlike their co-defendant, Frank E. Scarpola, who was convicted of second degree depraved heart murder, were convicted of felony murder, with the statutory crime of child abuse being the underlying felony. Under the Fifth Amendment Double Jeopardy Clause and Maryland common law double jeopardy and merger doctrines, the convictions for child abuse that were the underlying felonies for their murder convictions merged, as a matter of course, into the murder convictions.

The problem is that each of the petitioners was convicted under two counts of child abuse of Rita Fisher: one count charging abuse on June 24 and June 25, 1997, and one count charging abuse during the period of April 15 through June 23, 1997. As to each petitioner, either conviction might have been the felony conviction that must merge into the murder conviction. And as to each petitioner, it might appear at first glance to be more likely that the jury would have based the felony murder conviction on the child abuse that occurred on June 24

and June 25, since those dates coincide with the dates in the counts for murder. But that assumption is by no means the basis for a definite conclusion.

The medical examiner told the jury that the cause of Rita Fisher's death was malnutrition and dehydration. Between those two contributing causes, dehydration would take effect first, killing the victim before malnutrition would be lethal. On the basis of electrolyte changes in the child's body, the doctor concluded that the fatal dehydration was not an acute or sudden condition, but "chronic dehydration," a process that takes days, or even weeks. There was a loss of about fifteen percent of the child's body water.

After the court had instructed the jury, petitioner Fisher complained that the instruction on second degree felony murder, because the indictment charged her with two counts of child abuse, would permit the jury to convict her of murder based upon a conviction of only one of those counts even if the jury were to find that Rita's death resulted from abuse that occurred during the time covered by the other child abuse count. Recognizing that there might be merit in that complaint, the trial judge reinstructed the jury. He explained that, in order to be guilty of felony murder, a defendant must not only be guilty of some act of child abuse but of a particular phase of child abuse that was the underlying predicate felony. He said:

> In order to convict the defendant of this type of second degree murder the State must prove one, that the defendant committed a child abuse. Two, that the defendant or another participating in the crime killed Rita Fisher. And three, that the act resulting in the death of Rita Fisher occurred during the commission of child abuse and the defendant participated in the child abuse.

In view of the medical examiner's testimony and the instructions to the jury with respect to second degree felony murder, which pointedly did not indicate that a second degree felony murder conviction had to be based upon either one or the other counts of child abuse or any specific act or acts occur-

ring within the time specified in either child abuse count, conviction of each petitioner for second degree felony murder may have been based upon acts of denying Rita Fisher life-sustaining food and drink over the periods of time covered by both counts charging each petitioner of child abuse of Rita Fisher. At the very least, there is an ambiguity as to which child abuse felony was the underlying predicate felony for each petitioner's murder conviction. Any doubt as to which of the underlying felonies, or whether a combination of both, is the predicate felony or felonies for each petitioner's murder conviction must be resolved in favor of the petitioner. *See Snowden v. State*, 321 Md. 612, 619, 583 A.2d 1056 (1991), in which an ambiguity as to whether a conviction for robbery was based upon an assault by putting the victim in fear or upon a separate battery required the merging of both assault and battery into the robbery conviction.

There is one fundamental difference in the double jeopardy protection against subsequent prosecutions for the same offense and the protection against multiple punishments for the same offense. *In Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court held that, with respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the Legislature intended. Chief Justice Burger, writing for the majority, stated:

> Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's tasks of statutory construction is at an end, and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

459 U.S. at 368–69, 103 S.Ct. at 679–80, 74 L.Ed.2d at 544.

The same principle applies under Maryland common law double jeopardy and merger doctrines. In *Randall Book Corp. v. State*, 316 Md. 315, 323–24, 558 A.2d 715 (1989), Judge

.

McAuliffe, writing for this Court, cited *Missouri v. Hunter, supra,* together with *Albernaz v. United States,* 450 U.S. 333, 343–44, 101 S.Ct. 1137, 1144–45, 67 L.Ed.2d 275 (1981), and *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), for the proposition that

[t]he *Blockburger* rule does not provide the final answer in cases involving multiple punishment because, when specifically authorized by the Legislature, cumulative sentences for the same offense may under some circumstances be imposed after a single trial.... Accordingly, when dealing with the question of multiple punishments imposed after a single trial, and based on the same conduct, a critical question is one of legislative intent. The *Blockburger* test is helpful in such cases as an aid in determining legislative intent, but it is not dispositive.

"Consequently, specific or express authorization by the Legislature is a pre-condition for multiple punishments when two offenses are deemed to be the same under the required evidence test." *Lancaster,* 332 Md. at 412, 631 A.2d 453. In a footnote in that opinion, Judge Eldridge pointed out "the need for absolutely clear legislative intent to authorize multiple punishments when the multiple offenses are deemed to be the same under the required evidence test." *Id.* at 412–13, 631 A.2d 453.

The majority opinion, addressing in a footnote (op. 263, note 14) the issue of merger of child abuse into the conviction for second degree felony murder, acknowledges that merger would "implicate" legislative intent, citing *Holbrook v. State,* 364 Md. 354, 374, 772 A.2d 1240 (2001); *Whack v. State,* 288 Md. 137, 416 A.2d 265 (1980), *cert. denied,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981); *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983); *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *Faraga v. State,* 514 So.2d 295, 302–03 (Miss.1987); and *State v. Williams,* 24 S.W.3d 101, 117 (Mo.App.2000). *Holbrook* was a case in which the defendant was convicted of reckless endangerment and first degree arson. Neither merger nor double jeopardy were involved in that case because

those two crimes were clearly not the same offense. In *Whack,* this Court held that convictions, in the same trial, for armed robbery and use of a handgun in the commission of a felony could be punished separately and cumulatively even though they were the same offense under *Blockburger* because the legislature had clearly indicated an intent to authorize multiple punishments for the handgun offense and the underlying felony. *Missouri v. Hunter* and *Albernaz v. United States,* as noted above, were cited by Judge McAuliffe in the *Randall Booh Store* case for the proposition that "when dealing with the question of multiple punishments imposed after a single trial, and based on the same conduct, a critical question is one of legislative intent." In *Faraga,* the Supreme Court of Mississippi held that the offense of child abuse does not merge into the statutory offense of second degree felony murder when death resulted from the underlying felony of child abuse because "the statutes are designed to protect different societal interests." The court did not discuss the language of the two statutes; it merely cited, as authority for its ruling on this merger question, its prior decision in *Smith v. State,* 499 So.2d 750, 754 (Miss.1986), in which it rejected an argument for merger of burglary and first degree felony murder because the statutes governing those offenses were designed to protect different societal interests. The Missouri appellate court in *Williams,* affirming separate punishments for second degree murder and a related felony or attempted felony other than murder or manslaughter, based that decision on specific statutory language authorizing multiple punishments for such offenses. Missouri Revised Statutes, § 565.021.1 defines second degree felony murder, and specifically provides that "the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, other than murder or manslaughter."

*Faraga* was based on interpretation of legislative intent underlying the Missouri child abuse statute and that State's felony murder statute. The other cases cited in footnote 14 in the majority opinion are in total accord with prior decisions of

this Court: convictions in a single trial of two offenses that are the same offense under *Blockburger* may be punished separately and cumulatively if, as in *Whack*, or as in the Missouri cases of *Williams* and *Hunter*, there is a clear legislative intent to permit multiple punishments for the "same offense." In Maryland, however, there is no clearly indicated legislative intent to permit separate punishments for second degree felony murder and any underlying felony, particularly child abuse. There is, of course, no Maryland statute that even refers to second degree felony murder, much less one that defines that offense.

The General Assembly has clearly, expressly, and specifically authorized multiple punishments for offenses that are the same under the *Blockburger* test in prosecutions for child abuse. Md.Code (1957, 1996 Repl.Vol.), Article 27, § 35C defines, proscribes, and provides penalties for the felony of child abuse. As pointed out in the majority opinion, subsection (b)(2) of § 35C, increasing the maximum penalty for child abuse from fifteen years' imprisonment to thirty years' imprisonment if the child victim dies (twenty years at the time of these offenses) does not create an offense separate from child abuse but is merely an enhanced penalty provision. Subsection (b)(3) of § 35C, however, provides:

> The sentence imposed under this section [*i.e.*, child abuse whether fatal or non-fatal] may be imposed separate from and consecutive to or concurrent with a sentence for *any offense based upon the act or acts establishing the abuse.*

(Emphasis added.)

A battery or, as in this case, brutal treatment including multiple batteries as well as the deprivation of sufficient food and water to sustain Rita Fisher's life, were the acts "establishing the abuse." To the extent that those acts constituted separate offenses (certainly the batteries did), the legislative intent to permit separate punishments for those offenses that established the child abuse (the lesser included offenses) in addition to the punishments for the greater, inclusive felony of child abuse, is clearly stated. But second degree felony

murder is an offense that resulted from the child abuse when the child died as a consequence of the abuse; the murder was not an offense "establishing the abuse ." The General Assembly did not express an intent to authorize separate punishments for child abuse and second degree felony murder that results from—rather than "establishes"—the abuse. Undoubtedly, the members of the General Assembly did not contemplate that this Court would hold that there is such an offense as second degree felony murder and that child abuse may be a predicate felony for second degree felony murder. Courts may, and frequently do, interpret statutory language in accordance with what they perceive to be legislative intent. They may not, however, supply missing language when there is a *casus omissus* in the legislative scheme by judicially creating a statutory provision that the legislature would probably have added if it had given any thought to the problem it had not addressed.

The felony of child abuse is a lesser included offense within the greater offense of second degree felony murder if the child dies. That felony makes the death of the victim of the abuse felony murder; therefore that felony merges into the murder conviction. Because there is an ambiguity as to which of two counts of child abuse of Rita Fisher is the underlying felony for each petitioner's murder conviction, both of those child abuse convictions merge into each petitioner's murder conviction. And because there is no clear expression of legislative intent that multiple punishments may be imposed for second degree felony murder and for the child abuse that is the predicate felony for the murder conviction, I would reverse the judgment of the Court of Special Appeals insofar as it affirms the sentences imposed on petitioners, Rose Mary Fisher and Mary Utley, for child abuse, and instruct the intermediate appellate court to vacate those sentences. I would do so even though, as the majority opinion points out in footnote 14, neither petitioner raised any issue regarding double jeopardy. A sentence imposed in violation of the Double Jeopardy Clause of the Fifth Amendment is an illegal sentence, and an illegal sentence can, and should be addressed

even if not preserved or properly raised. *Walczak v. State,* 302 Md. 422, 427, 488 A.2d 949 (1985). *See* Md. Rule 4–345(a), which provides that an illegal sentence may be corrected at any time. We should correct it at this time, if for no other reason than the avoidance of additional litigation in the form of petitions for post conviction relief.